Filed 3/6/14  P. v. Valencia CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056735 & E056955 |
| v. | (Super.Ct.Nos. SWF023109 & SWF10001941) |
| JUAN VALENCIA, | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.

Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Meagan J. Beale and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

1

On November 16, 2012, we consolidated case Nos. E056955 and E056735, designating case No. E056735 as the master file. Defendant Juan Valencia challenges the jury trial convictions and resulting sentences in the trial in Riverside County Superior Court case No. SWF10001941 (E056955). In Riverside County Superior Court case No. SWF023109 (E056735) he was on three years' probation for possession of a concealed dirk or dagger (Pen. Code,[1] former § 12020, subd. (a)). His conviction in E056955 provided the basis to revoke probation in E056735, for which he was sentenced to two years in state prison to run concurrent to his sentence imposed in E056955. Defendant does not challenge the revocation or two-year sentence.

Following a jury trial, defendant was convicted of shooting at an inhabited dwelling (§ 246, count 2) with a personal firearm use allegation (§§ 667, 1192.7, subd. (c)(8)) and a criminal street gang allegation (§ 186.22, subd. (b)); two counts of assault with a semiautomatic firearm (§ 245, subd. (b), counts 3 & 4) with personal firearm use allegations (§ 12022.5, subd. (a) and § 1192.7, subd. (c)(8)) and criminal street gang allegations (§ 186.22, subd. (b)); and felon in possession of a firearm (former § 12021, subd. (a)(1), count 5).[2] On July 12, 2012, defendant was sentenced to the middle term of six years on the semiautomatic firearm assault conviction (count 4), enhanced four years for the firearm use finding and 10 years for the criminal street gang finding, for a total of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Beri Perez was charged as a codefendant. A joint trial began on January 9, 2012, but after the public defender's office was relieved, the trial court granted Perez's motion to sever. Defendant was appointed new counsel from the conflicts panel (hereafter defense counsel or trial counsel).

20 years.  A consecutive term of 15 years to life was imposed on the shooting at an inhabited dwelling conviction (count 2).  Defendant's total term is 20 years, plus 15 years to life.[3]

Defendant appeals, contending:  (1) the prosecutor misstated the law governing the charge of shooting at an inhabited dwelling; (2) there is insufficient evidence to support his semiautomatic firearm assault convictions; (3) this trial counsel rendered ineffective assistance; and (4) the prosecutor committed prejudicial misconduct.[4]

## I.  FACTS

On the evening of August 11, 2010, at approximately 9:00 p.m., Luis Calvillo and Freddy Coronel were standing in the alley of the apartment building, where his garage was located, on West Limited Street where he lived with his family.  Defendant and Perez, who were carrying handguns, approached the two.  Perez pointed his gun at Calvillo's face and said "'Raza Trece,'" and "'F[uck]' EYC."  He fired a round into the air and yelled "'Psycho, Raza 13.'"

Calvillo had known Perez, who lived in a nearby apartment, for about three years, and they had been friends.  Perez was a member of the Raza Trece criminal street gang; he was known as "Psycho," and about three months earlier he had been assaulted by

---

[3]  A term of 29 years was imposed and stayed pursuant to section 654 for the assault conviction (count 3) and a concurrent term of two years was imposed on the firearm possession conviction (count 5).

[4]  Defendant has petitioned for a writ of habeas corpus in case No. E058411.  We ordered the writ petition considered with this appeal.  By separate order, we summarily deny the writ petition.

3

Calvillo's cousin, who was a member of the Elsinore Young Classics (EYC), another criminal street gang. About a week prior to August 11, 2010, Perez contacted Calvillo and wanted to know the whereabouts of his cousin. When Calvillo told Perez he did not know, Perez became angry.

After Perez fired his gun in the air, he stepped back, and defendant approached Calvillo and pointed a gun in his face. Defendant "slant[ed]" the gun to the left and fired a shot over Calvillo's shoulder. Directly behind Calvillo was the storage room for the apartment trash containers, which was part of the apartment building and next to the stairs to the second floor apartment where Calvillo's sister lived. There were apartments above the trash can storage room and other apartments to the left. After the shot, Calvillo started running toward his sister's apartment, making a quick left "a little way." Defendant chased him, firing three or four more shots.

Calvillo's sister, Diana Calvillo, heard loud voices and looked out her livingroom window, which overlooks the alley. She saw Perez pointing a gun at her brother. She also saw defendant approach her brother and her brother run away. Defendant's father, Roberto Calvillo, also looked out the window when he heard shots. He and Diana went to the stairs and saw Calvillo running down the walkway between the apartment buildings with defendant in pursuit, firing at him.

After Calvillo escaped, defendant and Perez confronted Coronel. They gestured with their hands, making gang signs; Perez said "'La Raza.'"

4

Members of the Riverside County Sheriff's Department searched the crime scene; however, no bullet strike marks were discovered on the apartment buildings, and only one expended shell casing, a .380-caliber Winchester, was found in the alley. Deputy Jared Hansen described the exterior of the buildings as old and deteriorating. Sheriff's Patrol Corporal David Flannery, who found the shell casing, described the difficulty of locating strike marks and shell casings, particularly at night using flashlights. A search of defendant's residence produced a .22-caliber rifle and Raza Trece paraphernalia in his bedroom.

Detective John Juarez provided testimony regarding the Raza Trece and EYC gangs. Detective Juarez interviewed Perez, and the recording of the interview was played for the jury. The parties stipulated that Perez pled guilty to attempted murder arising out of this shooting. Detective Juarez also interviewed defendant, who admitted confronting Calvillo with Perez and firing his gun in the air and at the ground during the confrontation. Detective Juarez opined that the August 11, 2010, shooting was committed at the direction of, in association with, and for the benefit of the Raza Trece criminal street gang.

## II. SHOOTING AT AN INHABITED DWELLING

Defendant raises several issues regarding his conviction of shooting at an inhabited dwelling (§ 246). First, he contends the prosecutor misstated the law governing the charge of shooting at an inhabited dwelling by arguing that defendant "could be convicted of violating section 246 if the prosecution had proved that 'he was just at that location in close proximity to where people were living and he was shooting that

5

firearm.'"  Second, he faults his trial counsel for failing to object to the prosecutor's misstatement of the law during closing argument.  Third, he claims the prosecutor's misstatement of the law amounts to prosecutorial misconduct.  And finally, he asserts the evidence is insufficient to support his conviction of shooting at an inhabited dwelling.

**A.  Did the Prosecutor Submit an Incorrect Legal Theory Regarding Section 246?**

"The elements of [a section 246] offense are (1) acting willfully and maliciously, and (2) shooting at an inhabited house.  [Citation.]" (*People v. Ramirez* (2009) 45 Cal.4th 980, 985, fn. omitted.)  Here, the jury was instructed pursuant to CALCRIM No. 965 that in order to "'prove [] that the defendant is guilty of this crime, the People must prove that:  [¶]  "1)  The defendant willfully and maliciously shot a firearm, and;  [¶] "2)  The defendant shot the firearm at an inhabited house.'"  The acts proscribed by section 246 include shooting directly at an inhabited dwelling house and shooting "in close proximity to an inhabited or occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1356 [Fourth Dist., Div. 2] (*Overman*).)

In *Overman*, the defendant was charged and convicted under section 246 of discharging a firearm at an occupied building. (*Overman, supra,* 126 Cal.App.4th at p. 1350.)  The evidence showed the defendant fired his rifle at persons who were in close proximity to an occupied building, but no strike marks were found on the building.  (*Id.*

6

at pp. 1352-1353.) This court rejected the argument that "section 246 requires a defendant to shoot directly at and strike an occupied building." (*Id*. at p. 1357.)

In closing argument, the prosecutor urged the jury not to be confused about the use of the word "at" in CALCRIM No. 965.[5] He stated: "When it says that you have to shoot at an inhabited house, what it is here is in the law—there's two things. There is—is what is called a general intent crime. There's what—what's called a specific intent crime. [¶] [Discussion re: the difference between general and specific intent.] [¶] And what do we have here? There's nothing in this instruction that says he has to have the intent to strike the building. He doesn't need to have that specific intent to actually point the gun . . . or try to shoot at that building. All that's required is a general intent that he fire that gun. [¶] The fact that—that a gun or that bullet is in the area of where these occupied apartment buildings are, that's what makes it a 246. It's not required that he have this—the specific intent to shoot at that apartment building, just the fact that he has the intent to shoot that gun to do a wrongful act. All that's required is the fact that the apartment building happens to be right there, that those garbage bins are right there. Those apartments down that walkway or either side of him, that's what makes it a 246. He doesn't have the—doesn't have to have the intent to take the gun and, you know, fire it off into the building from four feet away. Just as long as he has the intent to shoot the gun and that—it just happens to be that those apartments are right there and occupied."

---

[5] The reporter's transcript references the word "act." However, this is clearly a typographical error and the word should have been "at."

7

In response, defense counsel argued: "The People must prove that the defendant willfully and maliciously shot a firearm and the defendant shot the firearm at an inhabited house. That's the law. It's not shot in the vicinity of a house because if—if that were the law, that's what the People in Sacramento would have said, in the vicinity of a house. On the ground in front of a house, in the air, down the street from a house, that's not what they say. . . . [¶] . . . [¶] . . . If he shot by a house or around a house, that's close enough. [¶] Ladies and gentlemen, it's not because that is not the law. That's not what this says. If they wanted to say, 'by' or 'close,' or 'in the vicinity of,' they would have said that." Later, defense counsel added, "The evidence does not support a conviction of [section] 246, firing at an inhabited house—at an inhabited house, not in the vicinity of an inhabited house, not close to an inhabited house, because the evidence doesn't support that was what happened that night."

On rebuttal, the prosecutor responded to defense counsel's remarks as follows: "Let's go to Count 2 then. . . . Count 2 is shooting at an inhabited house. This [is] where [defense counsel] and I disagree on what it means to shoot at an inhabited house. [¶] The evidence shows that [defendant] did actually shoot in the direction with that first shot at those garbage bins, but beyond that there is another interpretation of the words, not that you actually shot at and pointed at the building and fired, but the words can also mean that he was shooting at that location, at that apartment complex, when he was running through that walkway. [¶] He was at that apartment complex and he was firing a gun in close proximity to where families were living and enjoying their evening. That is the interpretation of the word that I'm asking [] you [to] adopt because that is what 246 is,

8

and we talked about the fact that this is a general intent crime. [Defendant] doesn't need to have the specific intent to shoot at a structure. If that was required, the legislature would have put in there that people have to prove that the building was actually struck. But know the word 'at' means that he was just at that location in close proximity to where people were living and he was shooting that firearm."

Defendant claims the prosecutor incorrectly argued that the jury could find him guilty "merely for discharging a firearm while present at the apartment complex . . . ." Referencing *People v. Manzo* (2012) 53 Cal.4th 880, he argues that the word "at" as used in section 246 means "in the direction of," or "towards." Here, the prosecutor did not argue that defendant could be found guilty simply on the basis of his location. Rather, he argued that defendant did not have to have the "specific intent to shoot at that apartment building . . . ." The prosecutor noted his disagreement with defense counsel regarding what it means to shoot at an inhabited dwelling and pointed out that in addition to the evidence showing defendant actually shot in the direction of the building with his first shot, "there is another interpretation of the words, not that you actually shot at and pointed at the building and fired, but the words can also mean that he was shooting at that location, at that apartment complex, when he was running through that walkway." This second kind of act falls under section 246, which "proscribes shooting *either* directly at *or* in close proximity to an inhabited or occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it." (*Overman*, *supra*, 126 Cal.App.4th at p. 1356, italics in original.)

9

"The act of shooting 'at' an inhabited or occupied target was defined in *People v. Chavira* (1970) 3 Cal.App.3d 988 . . . . There, the defendant and his associates fired several shots at persons 'congregated in front of, and on the driveway leading to' an inhabited dwelling. [Citation.] The defendant argued that the evidence was insufficient to support his section 246 conviction, because he did not fire 'at' the dwelling but 'at' persons outside it. [Citation.] The court rejected this argument, noting that '[d]efendant and his associates engaged in a fusillade of shots directed primarily at persons standing close to a dwelling.' [Citation.] On this basis, the court reasoned, '[t]he jury was entitled to conclude that they were aware of the probability that some shots would hit the building and that they were consciously indifferent to that result. That is a sufficient "intent" to satisfy the statutory requirement [of section 246].' [Citation.] [¶] As *Chavira* demonstrates, section 246 is not limited to the act of shooting directly 'at' an inhabited or occupied target. Rather, the act of shooting 'at' a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it. The defendant's conscious indifference to the probability that a shooting will achieve a particular result is inferred from the nature and circumstances of his act." (*Overman*, *supra*, 126 Cal.App.4th at p. 1356-1357, fn. omitted.)

During oral argument, defendant parceled out the prosecutor's words, "shooting at that location, at that apartment complex," and argued that these words could not be pushed into the theory of conscious disregard. However, these words were not the only words offered by the prosecutor. Rather, as the People aptly note, the prosecutor's

10

argument focused on the act of shooting *while running in the walkway*, which was in close proximity to people inside the apartment buildings. This argument described an act defined by this court to be proscribed by section 246. (*Overman*, *supra*, 126 Cal.App.4th at p. 1356-1357.) Moreover, the prosecutor reminded the jury that section 246 is a general intent crime. (*People v. Watie* (2002) 100 Cal.App.4th 866, 879.) Thus, the statute did not require a specific intent to strike an inhabited or occupied building. Rather, it required only that defendant shoot under circumstances that indicate a conscious disregard for the probability that such result would occur.

For the above reasons, we conclude the prosecutor did not present an incorrect legal theory to the jury.

**B.  Was Defense Counsel Ineffective for Failing to Object to the Prosecutor's Closing Argument?**

Having found that the prosecutor did not present an incorrect legal theory regarding section 246, we reject defendant's claim that his counsel was ineffective for failing to object to the prosecutor's closing argument.

**C.  Did the Prosecutor Commit Misconduct in Arguing that Defendant Could be Convicted of Section 246 if the Jury Found that He Discharged a Firearm While Present at the Apartment Building?**

Having found that the prosecutor did not present an incorrect legal theory regarding section 246, we reject defendant's claim that the prosecutor committed misconduct in his closing argument.

11

**D. Is Defendant's Conviction of Section 246 Supported by Sufficient Evidence?**

Defendant claims the evidence is insufficient to support his conviction of section 246, because (1) as far a Calvillo knew, defendant could have fired into the air, (2) there is no evidence where defendant was standing when he fired the gun, or the direction in which the shot was fired, and (3) the officers were unable to find any evidence that any of the shots fired hit any of the structures.

"On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

According to the record before this court, Calvillo was standing in the alley between the row of apartment buildings and the row of garages, with the trash can storage room behind him, when defendant approached. There were apartments above the trash can storage room, and other apartments to the left. At a distance of about three feet, defendant pointed his gun toward Calvillo's face, "slanting" it to the left, and fired. Calvillo claimed all he could see was "the flame go over here somewhere." Calvillo was pointing to the left side of his body when he said "'over here,'" and agreed that it was "[a]round [his] shoulder." On cross-examination, Calvillo reiterated that defendant had pointed the gun "[d]irectly at me[,]"and then "he kind of slanted [it], and it went to the side of my left shoulder." When asked if the shot was in the air, at the ground, or straight

12

ahead, Calvillo said, "I just remember it going to my left side somewhere. I didn't get to see where it went." Based on Calvillo's testimony, it was reasonable for the jury to infer that defendant fired at the apartment buildings and not up in the air.

Nonetheless, defendant questions Calvillo's testimony with respect to his position in regard to the trash cans and storage room. According to defendant, Calvillo's testimony as to where he was standing does not match the positions he marked on the photographic evidence. However, the People explain that Calvillo had difficulty identifying locations on the photographs. The People also maintain that Calvillo was consistent in his testimony that the trash can storage room was behind him. Moreover, as defendant chased Calvillo down the walkway between the apartment buildings, defendant continued firing.

Defendant's actions support a finding of conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it. (*Overman*, *supra*, 126 Cal.App.4th at p. 1356-1357.) The fact that the deputies were unable to find any bullet strike marks on the buildings is a red herring. First, the exteriors of the buildings were old and deteriorating. Second, the deputies were attempting to locate the strike marks at night using flashlights. And finally, as we previously stated, section 246 is not limited to the act of shooting directly "at" an inhabited dwelling. "Rather, the act of shooting 'at' a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious

13

indifference to the probable consequence that one or more bullets will strike the target or persons in or around it." (*Overman*, *supra*, at p. 1356-1357.)[6]

Based on the above, we conclude that defendant's conviction of committing an offense proscribed by section 246 is supported by sufficient evidence.

## III. ASSAULT WITH A SEMIAUTOMATIC FIREARM

Defendant contends the semiautomatic firearm assault convictions (§ 245, subd. (b)) in counts 3 and 4 are not supported by substantial evidence that a semiautomatic firearm was used. He further claims his trial counsel rendered ineffective assistance of counsel (IAC) in conceding guilt on those counts.

### A. Sufficiency of Evidence

As we stated above, in reviewing the sufficiency of the evidence, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow*, *supra*, 30 Cal.4th at p. 66.)

Section 245, subdivision (b), states: "Any person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years." According to defendant, of the three witnesses to the assault on Calvillo, not one testified that the defendant used a semiautomatic firearm. Neither defendant nor Perez identified the type of firearms that

---

[6] Clearly the commission of this offense does not test the marksmanship of the offender.

14

were used. Rather, defendant maintains the only direct evidence that a semiautomatic weapon was used is found in one of the 911 calls which were played for the jury. In that recording, the caller stated that one of the guns "was like a black pistol with like, like a compact pistol, not really like a revolver." However, the caller did not state that the gun was a semiautomatic, only that it was not like a revolver, and the caller attributed use of the semiautomatic to Perez, or the one who was yelling during the assault.

Defendant acknowledges the testimony of Deputy Hansen that a semiautomatic firearm ejects the spent shell casing at the time a shot is fired, along with the testimony of Patrol Corporal David Flannery that he found a single expended .380-caliber shell casing in the general area where the assault occurred. Nonetheless, defendant discounts these testimonies, contending there is no evidence that the spent shell casing is from one of the shots fired during the assault; it is equally plausible that it had been there for days or months. Further, given the testimony that there were a number of shots fired, defendant questions why the officers found only one spent shell casing. According to defendant, the fact that only one spent shell casing was found suggests it was from another source.

In contrast, the People point out that both defendant and Perez were armed with firearms, and both assaulted Calvillo and Coronel with their firearms. In distinguishing how shells are expended from revolvers and semiautomatic guns, Patrol Corporal Flannery testified that the basic difference between semiautomatic and revolvers is in how the expended shells are removed. Deputy Hansen added that in a semiautomatic firearm, bullet casings are discharged and will be found at the scene unless picked up. One casing was found at the scene. The People also note that one of the 911 callers

15

reported seeing a shooter "cock his pistol back" and described the pistol as "not really like a revolver." According to the People, this provided sufficient evidence to support the jury's finding that a semiautomatic firearm was used.

To the extent defendant argues that, at best, the evidence shows it was Perez who was in possession of a semiautomatic weapon, the People respond that the jury was instructed on aider and abettor liability, which made Perez and defendant liable for each other's actions. Nonetheless, defendant further argues that this court may take judicial notice of the fact that there are pistols which are neither revolvers nor semiautomatics, i.e., breech loaders, muzzle loaders, and fully automatics that can be "cocked." Thus, defendant submits that "even if there was proof that the spent cartridge was fired by one of the assailants . . . it could not possibly prove beyond a reasonable doubt that a semiautomatic pistol was used." While the evidence may show that a pistol other than a revolver or semiautomatic was used, it also shows that a semiautomatic weapon was used and a spent shell casing was found during a search of the scene. Other than the night in question, there was no evidence of any semiautomatic or other weapon being fired in that location. Thus, circumstantial evidence exists to support defendant's conviction with respect to counts 3 and 4. (*People v. Story* (2009) 45 Cal.4th 1282, 1296.)

**B. IAC**

Defendant contends his trial counsel was ineffective for conceding guilt on counts 3 and 4. However, as stated above, there was sufficient evidence to support defendant's convictions of assault with a semiautomatic weapon. Thus, this IAC claim fails.

16

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

In addition to the previous claims of IAC, defendant faults his trial counsel for (1) allowing defendant to go to trial on the charge of being a felon in possession of a firearm (former § 12021, subd. (a)(1)); (2) failing to object to the admission of seven 911 calls; (3) failing to object to the prosecutor's repeated elicitation of hearsay evidence; (4) failing to object to the prosecutor playing the recorded interview of Perez; and (5) failing to request a jury instruction on accomplice testimony.

### A.  Standard of Review

"The standard for establishing ineffective assistance of counsel is well settled.  A defendant must demonstrate that:  (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant.  [Citation.]  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  [Citation.]"  (*People v. Stanley* (2006) 39 Cal.4th 913, 954.)

### B.  Counsel's Strategy

Before considering each claim of IAC, the People note the importance of defense counsel's trial strategy.  Most importantly, defendant was charged with, but not convicted of, premeditated attempted murder.  (§§ 187, 664, count 1)  In arguing to the jury, trial counsel began by asking the jurors to find defendant guilty, but only of "what he did . . . not the trumped up charges . . . ."  Counsel told the jury, "The first thing is the easiest thing to—to take care of Count No. 5, being in possession of a firearm . . . .  [¶]  . . . He's

17

guilty." Regarding the other four counts, counsel argued they were "tough to arrive at." Regarding count 1, the attempted murder charge, defense counsel told the jury "this is . . . where you all are going to earn your money." He maintained the evidence showed no intent to kill, because although the gun may have been pointed at Calvillo's face, it was directed away from him when it was fired. Trial counsel conceded that pointing the gun at Calvillo's face was assault under count 2, but "there's no intent to kill."

As to count 2, the charge of shooting at an inhabited dwelling, trial counsel told the jury the shots were not fired "at" the dwellings, but conceded they were probably fired with gross negligence under the lesser included offense of section 246.3.[7] The jury was instructed on section 246.3. Counsel reminded the jury that at the outset, he had asked them to find defendant guilty "of what he did, not the trumped up charges, but what the evidence supports." He told the jury that the evidence did not support the section 246 charge, which required proof of shooting at an inhabited house, not in the vicinity or close to an inhabited house.

Defendant faced prison sentences of life with a minimum of 15 years before parole eligibility on the charges of attempted murder and shooting at an inhabited-dwelling, with their attendant enhancements. He was susceptible to imprisonment for 29 years on each felony assault charge and for three years on the firearm possession charge. If the jury accepted trial counsel's argument, then it would accept that evidence on the life term charges was not overwhelming, in view of the fact that defendant did not kill Calvillo

---

[7] Reporter's transcript states section 245.3. Again we assume this was a typographical error.

18

when he had the opportunity and there was no direct proof that any of his shots struck the apartment buildings. On the other hand, proof of the felony assaults and the firearm possession offenses was strong. Thus, trial counsel adopted a strategy of conceding guilt on the determinate term offenses and challenging the life term offenses.

## C. Concession that Defendant Was a Felon in Possession of a Firearm

Defendant's case came on for trial on January 10, 2012, at which time he was represented by a deputy public defender. On that day, he pled guilty to what was then count 5 of the information, that he had possessed a firearm after having been convicted of a felony in violation of former section 12021, subdivision (a)(1).[8] On January 17, the public defender declared a conflict, and the local conflicts panel (trial counsel) was appointed to represent defendant. Defendant was being tried jointly with Perez; however, the joint trial was aborted after the public defender was relieved and Perez's trial was severed. Trial counsel was appointed sometime prior to April 24, 2012.

When the case came back for trial with new counsel, the prosecutor told the trial court that he and trial counsel were discussing how to handle the firearm possession charge. The trial court suggested either stipulating to or bifurcating the felony conviction element. Because the jurors were waiting, the matter was deferred. On May 21, 2012, the jury heard evidence and rendered a verdict on the firearm possession charge.

---

[8] A search of defendant's home revealed a .22-caliber rifle and magazine loaded with bullets for the rifle under defendant's bed. Possession of the rifle formed the basis for the former section 12021, subdivision (a), charge.

19

Defendant contends "there is simply no satisfactory explanation for trial counsel allowing [defendant] to go to trial on a weapons charge to which he had already pled guilty." The People respond there was a tactical reason for trial counsel's decision to keep the charge before the jury, namely, to increase the charges upon which a concession of guilt could be made. However, defendant maintains that "[n]o tactical consideration could override" the prejudice created by allowing the jury to hear evidence that he unlawfully possessed a firearm. Assuming, without deciding, that trial counsel's performance fell below an objective standard of reasonableness in keeping the charge before the jury, we must determine whether there is a reasonable probability that, but for counsel's error, defendant would have received a more favorable result. Defendant argues he would have received a more favorable result because the jury would never have learned of his firearm possession. He asserts the "only evidence in the record regarding how [defendant] came to possess a firearm on the night of the assault was [his] recorded interview." In his interview, defendant explained that he had never shot a gun before and was given the gun by gang members who bullied him into carrying out the assault. Thus, defendant argues that after "hearing evidence that [he] kept a gun and loaded magazine at his home," "the prosecutor was able to argue that [defendant] was someone for whom firearms were a regular part of life, someone who kept his own gun under his own bed."

Even if trial counsel had not allowed defendant to go to trial on a weapons charge that he had already pled guilty to, we are unable to conclude it is reasonably probable that defendant would have received a more favorable result. Defendant was initially charged with attempted premeditated murder. In order to prove intent, along with defendant's

20

knowledge of the dangers that firing a firearm could produce (§ 246), evidence that a rifle with a loaded magazine was stored underneath his bed was relevant. Thus, the prosecutor would have introduced such evidence regardless of trial counsel's action. Moreover, despite the evidence, the jury did not convict defendant of attempted premeditated murder. Thus, there is no reasonable probability of a more favorable result. As defendant admitted, fellow gang members gave him a gun and he committed the assault on Calvillo. Accordingly, he was convicted of gang charges, shooting at an inhabited dwelling, and assault with a semiautomatic firearm.

### D. Admission of the 911 Calls

Defendant faults trial counsel for failing to object to the admission of seven 911 calls as irrelevant and highly prejudicial.

There were seven 911 calls that were recorded and admitted. When defendant's case first came on for joint trial with Perez, defendant's public defender counsel objected to the calls and the trial judge (Judge Angel M. Bermudez) excluded the first, second, fourth, fifth and seventh calls on the grounds they were cumulative, confusing, multiple layers of hearsay, unreliable, and emotionally inflammatory. In contrast, after the trial of Perez's case was severed from the trial of defendant's case, defendant's trial counsel failed to object to the introduction of any of the 911 calls, resulting in their admission into evidence. On appeal, defendant contends the calls had little probative value. We disagree. While the callers may not have known the exact details of the incident, they were able to confirm what the witnesses had testified to, namely, that multiple shots had been fired outside the apartment buildings; Spanish was spoken; gang names were

21

shouted; the shooter fled the scene in a vehicle; and that one of the weapons used was not a revolver.

Nonetheless, defendant contends the probative value of the calls was outweighed by the "number of statements in the 911 calls that were highly inflammatory, and therefore likely caused an emotional response that was prejudicial to [him]." Defendant notes that one caller said they had a house full of kids who were lying down on the floor because all of the doors and windows were open. Another caller described the incident as a "drive-by." Yet another caller said the shooters were shooting out of a truck. According to defendant, evidence of a drive-by shooting where children had to hide on the floor "is highly inflammatory" and likely to cause a juror who is a parent "to reach a verdict based on emotion rather than on the evidence presented at trial." Moreover, defendant asserts that the prosecutor's reference to the 911 calls in his closing argument certainly elicited a response from the jurors. Describing the prosecutor's case as weak, defendant argues "there is a reasonable probability that at least one juror voted to convict [him] of at least one charge because of his or her emotional response to the 911 calls." Thus, he maintains that admission of these calls requires reversal of his conviction. We disagree.

As the People point out, the jurors were aware that the shooting occurred in an apartment building where families lived. One caller describing the incident as a "drive-by" is no more prejudicial than the testimony that defendant fired shots in a narrow walkway between two occupied buildings while chasing after Calvillo. More importantly, despite admission of the 911 calls, defense counsel successfully obtained an

22

acquittal of the attempted murder charge.  For these reasons, we cannot conclude that counsel was deficient in failing to challenge admission of the 911 calls.

### E.  Failure to Object to Hearsay Evidence

Next, defendant claims trial counsel was ineffective by failing to object when the prosecutor elicited hearsay evidence from the witnesses.

#### 1.  Hearsay References to Defendant's Gang Membership

Defendant points out that Detective Juarez was allowed to testify that he "had information from another member that . . . defendant was also a member of Raza Trece. . . ." and that "another member stated [defendant] was an actual full-fledged member [of the gang] . . . ."  Ultimately, the detective stated, "[T]hrough our investigation it was determined [defendant] was at least an active participant and stated that he associated with the gang."  On appeal, defendant argues this hearsay evidence contradicts the gang expert's testimony and defendant's own admission that he sometimes associated with members of the Raza Trece gang.

In general, experts are permitted to identify and explain the information and sources on which they base their opinions, and such sources may include hearsay. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209 [Fourth Dist., Div. Two].)  An expert's opinion may be founded on various matters, regardless of whether those matters are admissible.  (*Ibid.*)  "*Crawford* [*v. Washington* (2004) 541 U.S. 36] does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her

23

opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Ibid.*)

Hearsay that is ordinarily inadmissible may form the proper basis for an expert's testimony. (Evid. Code, § 801, subd. (b); *People v. Harris* (2013) 57 Cal.4th 804, 847.) However, an expert may not testify to incompetent hearsay under the guise of stating reasons for an opinion. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 659, disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn 3.) An expert's need to consider extrajudicial matters and a jury's need for information sufficient to evaluate an expert opinion may conflict with a defendant's interest in avoiding substantive use of unreliable hearsay. Such conflicts are generally left to the trial court's sound judgment. Most often, any hearsay problems are cured by instructing the jury that matters admitted through an expert go only to the basis of his or her opinion and should not be considered for their truth. (*People v. Montiel* (1993) 5 Cal.4th 877, 919.)

Here, as the People point out, regardless of the hearsay evidence or Detective Juarez's expert testimony, defendant admitted being associated with the gang, joining other members, accepting a firearm from them, and participating in the attack on Calvillo to redress a prior act of disrespect. Any objection to the hearsay evidence would have been inconsequential when compared to defendant's own admissions. At best, an objection would have resulted in an instruction to the jury. However, given the record before this court, we can discern no prejudice from trial counsel's failure to object.

24

## 2. *Hearsay Identification of Defendant as Perez's Companion*

Detective Juarez testified as to the steps he took which led to the identification of defendant as Perez's companion in the shooting. He stated that Calvillo was able to identify Perez; however, he did not recognize the second assailant. Rather, Calvillo reported to the detective that Juan Carlos Castillo had identified defendant as Perez's companion. The detective prepared a photographic lineup with defendant's photograph and showed it to various witnesses, including Calvillo's companion, Coronel. Coronel, an EYC gang member, "didn't want any part of it." However, Coronel acknowledged that Perez's companion was in the lineup with defendant's photograph.

Although defendant challenges his trial counsel's failure to object to this hearsay testimony, the People point out that the out-of-court identifications had the nonhearsay purpose of explaining the course of Detective Juarez's investigation and how he ended up focused on defendant. (Evid. Code, § 1200, subd. (a).) They contend that, at worst, any objection would have resulted in a limiting instruction. (Evid. Code, § 355; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.) Further, the People point out that defendant admitted being Perez's companion. Thus, the People argue that "the failure to object was neither deficient performance nor prejudicial." We agree.

## 3. *Perez's Interview*

Defendant faults his trial counsel for not objecting to Detective Juarez's testimony regarding what Perez told him during an in-custody interview on the grounds that (1) the interview with Perez was a testimonial statement, the admission of which violated

25

defendant's constitutional right to confront and cross-examine (citing *Crawford v. Washington*, *supra*, 541 U.S. at p. 52), and (2) it was hearsay.

While trial counsel could have objected to Detective Juarez's testimony about Perez's statements as constituting hearsay, it would have been an exercise in futility. Perez admitted his gang membership, his moniker, and his prior run in with an EYC gang member. These admissions constitute statements against penal interest. (Evid. Code, § 1230.) Regarding defendant's constitutional challenge, the People point out that nothing Perez said implicated either himself or defendant in the shooting; defendant admitted his association with Raza Trece; and he admitted that the motive for attacking Calvillo was Perez's prior run in with an EYC gang member. We agree with the People and reject this claim of ineffective assistance.

### 4. *Primary Activity of the Gang Includes Grand Theft*

Detective Juarez testified that based on his investigation of Raza Trece, the primary activities of the gang were "felony assaults such as assault with a deadly weapon, and weapons possessions, and robbery . . . as well as low level narcotics sales." The detective described a robbery committed by three gang members who forcibly took the victim's cell phone.

Defense counsel did not object to this testimony; however, as previously noted, experts are allowed to testify to information that formed the basis of their opinions. Thus, any defense objection on grounds of hearsay would have, at best, resulted in a limiting instruction.

### 5. *Failure to Request Accomplice Instructions*

Defendant contends he and Perez were accomplices, as shown by the fact that Calvillo testified they both assaulted him with a firearm. Thus, defendant argues that when Perez's recorded interview was played for the jury, the jurors should have been instructed with CALCRIM No. 325 regarding how to evaluate the testimony of an accomplice. He faults trial counsel for failing to request such instruction. Assuming trial counsel's deficiency, we consider whether defendant was prejudiced. As we previously noted, Perez's statements did not connect defendant to the charged crimes, with the exception of the gang allegations. However, defendant admitted his association with the Raza Trece gang, along with the prior run in with an EYC gang member, and that he went with Perez and that he "just scaring" Calvillo. Other statements made by Perez were corroborated by both Detective Juarez and Calvillo. Because there was sufficient corroboration of Perez's statements, the failure to instruct on accomplice testimony was harmless. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303.)

### 6. *Cumulative Effect*

Defendant contends that the cumulative effect of the above asserted deficient acts undermined his right to a fair trial. While we may have agreed that some of defense counsel's actions were deficient, we have not concluded that defendant was prejudiced by any of such actions. Furthermore, we do not agree that the cumulative effect resulted in prejudice. Despite strong evidence that defendant attempted to murder Calvillo, the jury acquitted him of the charge.

## V.  PROSECUTORIAL MISCONDUCT

Finally, defendant contends the prosecutor committed prejudicial misconduct when he tried defendant on a charge (felon in possession of a firearm) to which he had already pled guilty.

Prior to trial, the following discussion was held:

"[THE PROSECUTOR]:  I don't think it's going to become an issue today, but me [*sic*] and [defense counsel] are trying to figure out the best way to handle Count [5], which [is] the [former section] 12021(a) (1) charge that a .22-caliber rifle was found during the search warrant of [defendant's] house.

"THE COURT:  Usually there is a stipulation that there is a felony conviction, or you can ask to bifurcate the felony-conviction portion of that as well.  I'll grant that if that's—you know what the party's intention was.

"[DEFENSE COUNSEL]"  That's what I'd like to do, Your Honor, and we can work out a stipulation.

"THE COURT:  The instructions, though, are kind of modified.  It would be almost, you know, possession of a firearm and, you know—in this particular situation, you know, if he's found in violation of a firearm or possession of a firearm per the CALCRIM instruction would probably change your strategy, so you may want to just consider that.

"[THE PROSECUTOR]:  Well, I'm asking it not be bifurcated and I can give my reasons for that now, or we can take it up another time.  I mean—

28

"THE COURT: Why don't we take it up another time, because we've got our jurors sitting out there. Maybe a little more a convenient break if you are not going to use you[r] opening statement.

"[THE PROSECUTOR]: I'll stay with my opening.

"THE COURT: Okay. And—

"[THE PROSECUTOR]: I will talk about part of that search warrant, though, in the sense that gang indicia w[ere] found during—

"THE COURT: You can indicate there was a firearm that was—that was found as well as, but you know the—the portion of the—that he had a prior conviction, you know, that's—there might be another way of doing that without prejudicing the defendant. So—

"[THE PROSECUTOR]: Yeah. I'll stay away from that, Your Honor."

Ultimately, the prosecutor introduced evidence that defendant possessed a firearm; however, the jury did not hear any evidence of, nor were they instructed on, defendant being a felon. The verdict form also omitted any reference to defendant being a felon. Nonetheless, defendant contends the prosecutor committed misconduct because, "while the jury was not informed that it was unlawful for [defendant] to own a firearm because he had previously been convicted of a felony . . . it is a virtual certainty that one or more of the jurors knew that convicted felons were prohibited from owning firearms, and assumed that [defendant] had previously been convicted of a felony."

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows. A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore . . . when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.] (*People v. Crew* (2003) 31 Cal.4th 822, 839-840.) The record reflects defendant did not object to the prosecutor introducing evidence that defendant possessed a firearm. Further, the record shows that prior to trial, the court indicated it would entertain a stipulation that defendant suffered a felony conviction or grant a request to bifurcate the felony-conviction portion. Thus, it appears there is nothing indicating that an objection would have been fruitless. As the People argued in their brief and during oral argument, defendant should not be raising a claim of prosecutorial misconduct for the first time on appeal. The time to raise it was during the trial, and the place to raise it was the trial court. As a result, we conclude defendant has

30

forfeited this issue for appeal. Nevertheless, we will address the merits of defendant's contention because it is easily resolved.

As we previously noted, defendant was charged with attempted premeditated murder. In his interview, he initially denied any involvement in the incident, claiming the weapon found under his bed was purely for protection, and that he had never fired the weapon. In order to prove intent, along with defendant's knowledge of the dangers that firing a firearm could produce (§ 246), evidence that a rifle with a loaded magazine was stored underneath his bed was relevant. According to defendant, he was just scaring Calvillo, and when Calvillo came around, defendant "discharged" the weapon a few times. He claimed that he panicked and fired two shots at the ground while Calvillo was running. Defendant denied ever pointing the weapon at Calvillo's face. Thus, even if the prosecutor had not tried defendant on the former section 12021, subdivision (a)(1) charge, he would have introduced evidence of the loaded weapon found under defendant's bed in support of the charge of attempted premeditated murder.

Nonetheless, even if we assume prosecutorial misconduct, we conclude that it was harmless because it was not reasonably probable that defendant would have obtained a more favorable result had the misconduct not occurred. (*People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1260; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant's claim that "it is a virtual certainty that one or more of the jurors knew that convicted felons were prohibited from owning firearms, and assumed that [he] had previously been convicted of a felony" amounts to nothing more than mere speculation. Despite the evidence admitted at trial, including defendant's unlawful possession of a firearm, the

31

jury found him not guilty of attempted premeditated murder.  Defendant pled guilty to the weapons possession charge, and thus, the fact that the jury also found him guilty of the charge is harmless.  As defendant admitted, fellow gang members gave him a gun, he intended to scare Calvillo, and he committed the assault on Calvillo.  Accordingly, the jury convicted him of gang charges, shooting at an inhabited dwelling and assault with a semiautomatic firearm.  In other words, he received a fair trial.

## VI.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

J.

We concur:

RAMIREZ

P.J.

CODRINGTON

J.