Filed 9/9/14  P. v. Nezey CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DORIAN NEZEY,<br><br>    Defendant and Appellant. | 2d Crim. No. B237658<br>(Super. Ct. No. BA365391)<br>(Los Angeles County) |

Dorian Nezey appeals the judgment entered after a jury convicted him of shooting at an inhabited dwelling (Pen. Code,[1] § 246) and two counts of second degree robbery (§ 211).  The jury also found the crimes were committed for the benefit and in furtherance of a criminal street gang (§ 186.22, subds. (b)(1)(C), (b)(4)).[2]  The trial court sentenced him to 19 years to life in state prison, consisting of 15 years to life for the section 246 charge, three years for the robbery charged in count 2, and one year for the robbery charged in count 3.  In challenging his conviction for shooting at an inhabited

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Appellant's codefendant Deon Stillwell was charged with shooting at an inhabited dwelling and with being a felon in possession of a firearm (former § 12021, subd. (a)(1)).  The robbery counts against appellant were severed.  Stillwell was convicted as charged, and we affirmed the judgment in a separate appeal.  (*People v. Stillwell* (Dec. 19, 2011, B224396) [nonpub. opn.].)  The jury was unable to reach a verdict as to appellant on the section 246 charge and a mistrial was declared.  Appellant was convicted on retrial and was subsequently convicted on both robbery counts.

dwelling and the attendant gang enhancement, appellant contends (1) the court erred in denying his motion for a mistrial; (2) the court abused its discretion in excluding certain evidence; (3) the prosecutor committed misconduct; (4) the evidence is insufficient to support the "primary activities" element of the gang enhancement; and (5) the judgment must be reversed due to cumulative error and ineffective assistance of counsel. Appellant does not challenge his robbery convictions, but claims the gang enhancements on both counts must be reversed for insufficient evidence. We affirm.

STATEMENT OF FACTS

*Shooting at an Inhabited Dwelling*

On June 7, 2009,[3] Los Angeles Police Officers Gabriel Holguin and Nicholas Hartman were assigned to monitor the 59 Hoovers, a clique of the Hoover Crips gang. The officers went to the 59 Hoovers' "headquarters" at 59th Street and Denver Avenue and made contact with a group of men that included appellant and Stillwell. Officers Holguin and Hartman spoke with the men for a few minutes and then left.

Not long after, a group of young African-American men walked by Lynn Hall's residence on West 62nd Street. Hall and a friend were sitting on Hall's front porch while two of her children were playing in the yard. Three of the men—two of whom Hall later identified as appellant and Stillwell—"mad-dogged" Hall as they walked by.[4] Appellant and Stillwell returned about two minutes later. Stillwell told Hall, "You better g[e]t the fuck out of this neighborhood if you know what's good for you, bitch." Hall grabbed her children and went inside. Moments later she heard gunshots and the sound of a breaking window.

Hall's neighbor Iliana Vargas looked outside and saw several adults and children in front of Hall's house. Several African-American men were standing by two

---

[3] All further date references are to the year 2009.

[4] Ten days after the incident, Hall identified appellant and Stillwell's photographs out of four six-pack lineups. As to appellant's photograph, she wrote "[t]he person I circled looks close to the guy I saw approach my yard with the group that threatened me and shot up my house." She wrote that Stillwell "looks familiar to the one that talked shit with the group."

cars that were parked in front of the house. Vargas subsequently heard gunshots and the sound of burning rubber. A minute or so later, she looked outside again and saw Stillwell and another man who fit appellant's description running down the street. Stillwell was holding a revolver and shooting toward Hall's house. The man who fit appellant's description was holding a longer gun, but Vargas did not see him fire it.

Although Vargas could not identify appellant or Stillwell in court, she identified Stillwell during an in-field showup and described the other man as having appellant's same stature and build. Her description of both men's clothing was also substantially consistent with Hall and Officer Holguin's descriptions of the clothing appellant and Stillwell were wearing that day.

Officers Holguin and Hartman were still nearby when they received a call regarding the incident. The call informed them of the location of the shootings, but did not give any description of the suspects. As the officers were driving toward the scene, they saw appellant on foot turn the corner from 62nd Street onto Figueroa, then quickly walk up Figueroa toward Slauson Avenue. After speaking with Hall and Vargas, the officers identified appellant and Stillwell as likely suspects. Vargas also told the officers she had seen the suspects getting out of a blue Ford Explorer, Bronco, or truck.

The police found two bullet strikes in the wall of Hall's house and a pellet mark from a shotgun near the front window. Single bullet holes were found in a vehicle parked 40 feet away on the same side of the street as Hall's residence, and in a car and a van parked on the other side of the street. A spent shotgun shell was found on the sidewalk.

Someone at the scene told Officer Holguin that two men with guns were seen entering a residence a block away at 533½ Gage Avenue. Officers were dispatched to the residence and to Stillwell's nearby residence at 679 Gage. In a bedroom at 533½ Gage, officers found a shotgun with a live round in the chamber, a live shotgun shell, and a revolver with five spent casings. Officers also retrieved a copy of a state identification card belonging to Kentrell Castine and an envelope addressed to him at the residence.

3

As the police were arriving at 679 Gage, Stillwell and another man were seen leaving in a blue Ford Explorer. Stillwell and the other man were stopped shortly thereafter. Vargas identified Stillwell as one of the shooters during an in-field showup.

When Hall was questioned at the scene, she told the police she had recently ended a relationship with a 59 Hoovers associate and he had told her to move out of the neighborhood. Hall refused to disclose her ex-boyfriend's identity because she had to continue living in the neighborhood and did not believe the police would protect her. She also knew the monikers of some of the other men involved but did not reveal them out of fear for her safety.

On June 17, Hall was interviewed by Detective Dean Vinluan. During the interview, Hall identified Kentrell Castine as her ex-boyfriend. Detective Vinluan, however, did not include this information in his report. Hall reiterated her identification of Castine when she testified at trial.

A firearms analyst testified that the spent shotgun shell and shell casings recovered from the scene of the shootings were discharged from the shotgun and revolver found at 533½ Gage. Genetic evidence recovered from the two weapons was found to contain a mixture of DNA from three or more individuals. Stillwell could not be excluded as a contributor of DNA recovered from the shotgun, while the results as to appellant were inconclusive. Both men were excluded as contributors of DNA found on the revolver.

On July 8, appellant shouted and flashed gang signs at people attending a rival gang member's funeral. He then got into a car that sped away. When the police attempted to conduct a traffic stop of the car, appellant fled on foot. He was arrested after a brief pursuit.

Officer Holguin testified as the prosecution's gang expert. The 59 Hoovers are one of several cliques or subsets of the Hoover Crips. The cliques' names correspond to the number of the streets they claim as their territory. The 59 Hoovers' territory includes the area where Hall lived.

4

The 59 Hoovers had about 100 active members at the time of the shootings. The gang's primary activities included robberies, marijuana sales, and illegal weapons possession. Appellant and Stillwell were both members of the gang. Appellant's gang-related tattoos include one that says "50's" above his right eye, the Roman numeral "V" behind his left ear, the Roman numeral "IX" behind his right ear, "HCG" on the top of his left hand, a die showing a five on his right hand, and a die showing numbers adding up to nine on his left hand.

When presented with a hypothetical based on the facts of the case, Officer Holguin opined that the crime was committed in association with and for the benefit of a criminal street gang. It would be seen as a sign of disrespect if a woman who was no longer associated with the gang did not leave the neighborhood when told to do so. Shooting at the woman's house would benefit the gang by promoting fear and intimidation in the neighborhood. It would also boost the perpetrators' reputations on the street and within the gang.

*Robberies*

At around noon on May 29, Shanisha Golden was walking on Hoover Street when appellant rode up on a bicycle. Appellant asked Golden what her name was and if she had a boyfriend. Golden gave appellant a false name and told him she was going to meet someone. As Golden began walking away, appellant grabbed the gold chain necklace she was wearing. The necklace had a pendant in the shape of a star, which is a symbol of the Hoover Crips. Appellant took the necklace after a struggle and rode away.

Golden called 911 and reported being robbed by someone "from Hoover." Golden believed the perpetrator was a member of the gang based on the location of the crime. She said appellant had warned her, "Bitch, you better not tell the police my name." She later told the police the perpetrator had a tattoo with writing over his right eye and a large scar on the right side of his neck. She also said the man was known as "T," which is short for "Trouble." Golden identified appellant from a photograph based

5

on his tattoo and scar. When asked to identify appellant at trial, however, Golden claimed she had never seen him before.

At about 2:00 p.m. on June 30, Allen Cardoza saw a man beating Timeshia Pierson on the corner of 74th Street and Figueroa. The man hit Pierson numerous times, then took her purse and walked away. The man went through the purse, threw it in the gutter, and continued walking. Pierson was interviewed at the scene, but the police were subsequently unable to locate her. Cardoza identified appellant from a photograph based on his tattoos. When Cardoza testified at trial, he said appellant did not look familiar.

Although the robberies were committed within the territories of two other cliques of the Hoover Crips, appellant had tattoos indicating that he claimed membership in those cliques as well. Officer Hartman had seen appellant with the other cliques' members and had also seen him within their territories. Moreover, members of the separate cliques were allowed to commit crimes anywhere within the Hoover Crips' territory.

When presented with a hypothetical based on the facts of the case, Officer Holguin opined that the robberies were committed for the benefit of a criminal street gang.

## DISCUSSION

### Shooting at an Inhabited Dwelling (§ 246)

#### Mistrial Motion

Hall identified Castine when she was interviewed by Detective Vinluan 10 days after the shootings. The detective, however, did not include this in his report and did not disclose it to the prosecutor until the third day of retrial of the section 246 charge. By then, appellant's attorney knew about Castine—indeed, counsel had learned the information from Hall herself just prior to retrial and had referred to Castine in his opening statement.

Counsel nevertheless moved for a mistrial, claiming the delayed disclosure had prevented him from adequately preparing a defense. The court denied the motion with a qualification: If appellant were convicted, the court would delay sentencing to

allow counsel to investigate Castine and move for a new trial if warranted by the results of that investigation. At appellant's request, the court also instructed the jury pursuant to CALCRIM No. 306 that it could consider whether the delayed disclosure of Castine's identity had prevented appellant from fully presenting his defense or otherwise interfered with his right to a fair trial.[5]

In subsequently moving for a new trial on the section 246 charge, defense counsel offered that Castine "was residing in Georgia at the time of . . . [re]trial and was not available for immediate interview or subpoena." The court denied the motion, noting it had offered to pay for any post-trial investigation of Castine and that "months have gone by to allow the defense to pursue that [investigation] if they felt . . . it was warranted[.]"

Appellant contends the court erred in denying his mistrial motion. He claims the prosecution's delayed disclosure of Hall's identity of Castine "was *Brady*[6] error, or at a minimum, error under the California rules governing discovery." He claims the court's ruling also rendered it impossible for his trial attorney to provide constitutionally effective assistance of counsel. We are not persuaded.

"[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

---

**5** The jury was instructed: "Both the prosecution and the defense under our rules must disclose their evidence to the other side, each other, before trial within a certain limited time period that's set by law. [¶] Failure to follow this rule may deny the other side a chance to produce all relevant evidence, to counter opposing evidence or to receive a fair trial. [¶] The prosecution by way of the D.A. under the circumstances of this case failed to disclose that Ms. Hall had said that Mr. Castine had been a boyfriend. [¶] In evaluating the fact and significance of that piece of evidence you may consider the effect, if any, of that late disclosure."

**6** (*Brady v. Maryland* (1963) 373 U.S. 83.)

Appellant fails to demonstrate that a mistrial should have been declared due to *Brady* error. "'. . . There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042–1043.) Under *Brady*, "evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery." (*People v. Morrison* (2004) 34 Cal.4th 698, 715.)

The evidence that Hall had identified Castine as her ex-boyfriend was not "suppressed" under *Brady* because it was presented at trial. Appellant also fails to show that Castine's identity was both material and favorable to the defense, or that appellant was prejudiced by the delayed disclosure of that information. In attempting to make these showings, appellant simply asserts that Castine's identity was an "important fact" because "had counsel known that [Castine] was, in fact, named by Hall as her ex-boyfriend prior to trial, counsel could have obtained evidence favorable to the defense or leading to evidence favorable to the defense." This speculative assertion does not establish prejudice. Appellant must do more than hypothesize that an investigation may have led to some unspecified evidence that may or may not have been favorable to him. (See *People v. Salazar, supra,* 35 Cal.4th at pp. 1043, 1049–1050 [*Brady* does not require disclosure of information that "might" prove helpful to the defense].)

We also reject appellant's assertion that the court should have declared a mistrial on the ground the prosecution violated the reciprocal discovery requirements set forth in section 1054.1. The statute "requires the prosecution to disclose to the defense, in advance of trial or as soon as discovered, certain categories of evidence 'in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies.'" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; § 1054.1.) It is undisputed that the prosecutor was not aware of Hall's statement identifying Castine until the detective revealed it to her on the third day of

retrial. The prosecutor then immediately disclosed the evidence to the court and defense counsel. Any prejudice appellant may have suffered as a result of the delayed disclosure was eliminated by the giving of CALCRIM No. 306.

Appellant also fails to demonstrate that the delayed disclosure of Castine's identity caused his trial attorney to provide constitutionally ineffective assistance of counsel. As we have noted, counsel discovered the information through his own investigation and had ample time to investigate Castine in anticipation of a new trial motion. Moreover, appellant merely speculates that an earlier investigation would have led to evidence favorable to the defense. His claim of ineffective assistance accordingly fails. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1052, 1082, fn. omitted, disapproved on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [ineffective assistance claim premised on inadequate investigation lacks merit where defendant "does not demonstrate that the investigation would have yielded favorable results and hence cannot demonstrate that its omission adversely affected the outcome within a reasonable probability"].)

*Unidentified Witness Statement*

During their investigation of the shootings, the police discovered that one of the vehicles struck by gunfire was registered to Darrell Anderson. Officer Holguin knew of Anderson and believed he was a member of the Rolling 20's Hollywood Crips, a rival gang whose territory is adjacent to the 59 Hoovers' territory. On retrial of the section 246 charge, appellant's attorney sought to admit this evidence along with a statement from a police report indicating that "an unidentified witness stated that they saw Darrell Anderson there and he was shooting." Counsel argued the statement was admissible hearsay because it was corroborated by the evidence that Anderson's vehicle was at the scene and thus had "an indicia of reliability." Counsel asserted that the statement was relevant to impeach Hall because Hall "said she strictly dates Crips and coincidentally there's a Crip in enemy territory . . . parked across the street from her house. [¶] That would give a very reasonable inference that she is protecting her boyfriend who did the shooting and as a good faith belief the unknown person saying he

9

was shooting." Counsel alternatively claimed the statement was admissible as nonhearsay to explain why the police investigated Anderson's vehicle. The court excluded the evidence, reasoning that "it's too speculative based on the information that I have now."

Appellant contends the court erred in excluding the statement. For the first time on appeal, he claims the statement should have been admitted as a spontaneous declaration under Evidence Code section 1240. This claim was not raised below and is thus forfeited. In any event, appellant fails to make the requisite showing for admissibility under Evidence Code section 1240. His offer of proof at trial consisted of the prosecutor's representation that "an unidentified witness stated that they saw Darrell Anderson there and he was shooting." The record thus provides no insight into whether the declaration was either spontaneous or made under the stress of excitement, both of which are prerequisites for admissibility of a hearsay statement under subdivision (b) of Evidence Code section 1240.

We also reject appellant's claim that the statement should have been admitted for the nonhearsay purpose of explaining why the police investigated Anderson's car. Testimony offered to explain why an officer acted as he or she did in a given situation is only relevant when the good faith or reasonableness of the particular action is at issue. (*People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110.) That is not the case here. The officers' reasons for investigating Anderson's car were irrelevant to prove or disprove that appellant was guilty of shooting at Hall's residence.

In any event, any error in excluding the statement was harmless. Contrary to appellant's claim, the application of ordinary rules of evidence does not implicate any of his rights under the federal Constitution. Any error in excluding hearsay pursuant to the Evidence Code is thus reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Harris* (2005) 37 Cal.4th 310, 336 (*Harris*); compare *Chambers v. Mississippi* (1973) 410 U.S. 284 [state evidentiary rule prohibiting defendant from impeaching his own witnesses violated right to due process].) Evidence that Anderson was one of the shooters would not have aided appellant's defense. As

appellant acknowledges, the unidentified witness did not say that Anderson was the only shooter; on the contrary, he or she said that Anderson "was shooting at the individuals who shot Hall's house." Moreover, there was ample evidence identifying appellant as one of those individuals. Because it is not reasonably probable that appellant would have achieved a more favorable result had the statement been admitted, any error in its exclusion was harmless. (*Watson, supra*, at p. 836; see also Evid. Code, § 353, subd. (b).)

*911 Calls*

In the course of discovery, the defense received transcripts of the 911 calls that were made in response to the shootings. Appellant sought to introduce the transcripts in their entirety on the ground that the callers' statements qualified as spontaneous declarations under Evidence Code section 1240. In declining the request, the court noted that "half of those calls or more are . . . double, triple hearsay. I can't let that in."

Appellant contends the court erred in excluding the transcripts. We conclude otherwise. The requisite foundation for admissibility under Evidence Code section 1240 is absent. Other than one caller who identifies herself as "Cecilia," the identity of the individuals who made the calls is unknown. Some of the statements included in the transcripts—like one in which the caller conveys her brother-in-law's description of a possible suspect—are double hearsay. Two calls were made well after the shootings had stopped. In other calls, it is not clear whether the declarant is relating his or her own eyewitness observations, or merely drawing factual inferences from those observations.

Even if appellant could establish that some of the statements in the transcripts should have been admitted as spontaneous declarations, he fails to demonstrate that their exclusion compels reversal of his conviction. To establish prejudice, appellant must show it is reasonably probable he would have achieved a more favorable result had the evidence been admitted. (*Harris, supra*, 37 Cal.4th at p. 336; *Watson, supra*, 46 Cal.2d at p. 836.) Appellant fails to make such a showing. The

11

majority of the statements were consistent with the prosecution's theory of the case. To the extent some of the statements supported appellant's theory that more than two shooters were involved, the jury could infer this from the evidence that bullet holes were found in vehicles across the street from Hall's residence. In any event, additional evidence of a third shooter would have been insufficient to undermine the evidence of appellant's guilt. Any error in excluding the statements was harmless.

*Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct during closing argument by commenting on the lack of evidence that a third person was involved in the shootings. We agree that the prosecutor should have refrained from making the comments, but deem the error harmless.

"'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

"If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument. [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 111.) "No misconduct exists if a juror would have taken the statement to state or imply nothing harmful. [Citation.]" (*Ibid.*)

In his closing argument, appellant's attorney argued that the evidence suggested there had been crossfire and asked, "Weren't the fact bullets are going both ways, isn't that more consistent with there's a fight between people?" Counsel then

12

posited, "Was this gunfire exchange between people at [a] party [at Hall's house] and somebody in [a] car? Think about it. It conforms to all evidence, the credible evidence given in this case."

In rebuttal, the prosecutor characterized appellant's theory as a "red herring" and argued, "Gunfire in both directions. There were no – there was no evidence. The police were never directed to a third shooter. There was only evidence that two people were shooting that day on that street."

Appellant's attorney objected, and the court overruled the objection. Counsel subsequently moved for a mistrial, claiming the prosecutor improperly "commented on the absence of evidence of somebody else shooting when there was evidence." The prosecutor believed her comments were proper because "as it is in this trial there was no evidence that any other people were shooting." The court declined to order a mistrial.

Appellant argues that the prosecutor's challenged remarks were deceptive and misleading in light of her knowledge that (1) an unidentified witness said that Anderson was present and shooting; and (2) one of the 911 callers reported seeing someone shooting from Hall's residence. Although evidence of these facts was excluded, appellant contends the prosecutor had an obligation to refrain from arguing the lack of such evidence. For support, he cites two cases in which the prosecutor capitalized on erroneous evidentiary rulings (*People v. Daggett* (1990) 225 Cal.App.3d 751; *People v. Varona* (1983) 143 Cal.App.3d 566), and another in which the prosecutor commented on the defendant's failure to call a witness the prosecutor knew had rendered himself unavailable to testify (*People v. Frohner* (1976) 65 Cal.App.3d 94, 108-109).

Here, it is technically correct that the prosecutor did not exploit any erroneous evidentiary ruling in stating there was no evidence of a third shooter. The prosecutor went too far, however, in representing that "the police were never directed to a third shooter." It is misconduct for a prosecutor to argue facts she knows to be false. (*People v. Varona, supra,* 143 Cal.App.3d at pp. 569-570.) The prosecutor knew the

13

police had investigated eyewitness reports of a third shooter, so her assertion to the contrary was misconduct.

Although we conclude that the prosecutor's comment was improper, it did not result in prejudice. A single improper comment in a lengthy argument does not render a trial fundamentally unfair under the federal Constitution. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250.) Such instances of misconduct are harmless absent a reasonable probability the error affected the outcome. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1324; *People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1260.) Here, the prosecutor's comment was brief and related to an issue collateral to the determination of appellant's guilt. Moreover, we presume the jury followed the instruction that the attorney's remarks were not evidence. (*People v. Anzalone* (2013) 56 Cal.4th 545, 557.) Although the prosecutor told the jury there was no evidence of a third shooter, appellant's attorney identified evidence indicating otherwise. Any error occasioned by the prosecutor's improper comment was accordingly harmless.

*Gang Enhancement*

Appellant contends the gang enhancement on the section 246 charge must be reversed because the evidence is insufficient to prove the "primary activities" element of the gang statute (§ 186.22, subd. (f)). We are not persuaded.

We review findings on a gang enhancement allegation under the same substantial evidence standard as any other conviction. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656-657.) Accordingly, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements [of the enhancement] beyond a reasonable doubt. . . . In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

The gang statute applies to felons whose crimes were committed for the benefit of a "criminal street gang." (§ 186.22, subd. (b).) To establish that a group is a criminal street gang, the prosecution must show (1) the group has "as one if its primary

14

activities the commission of one or more" statutorily enumerated crimes, and (2) the group's "members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) To satisfy the primary activities element, the commission of an enumerated crime must be one of the group's chief or principal occupations. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222 (*Vy*).)

The primary activities element may be established by expert testimony that the gang was primarily engaged in the commission of a statutorily enumerated offense. (*Vy, supra*, 122 Cal.App.4th at pp. 1222-1223.) Detective Holguin opined that the 59 Hoovers' primary activities included selling marijuana, which is one of the crimes enumerated in the gang statute. (§ 186.22, subd. (e)(4).) The detective also provided a sufficient basis for his opinion. He detailed his experience working in the gang unit and monitoring the activities of the 59 Hoovers. He explained how he had maintained frequent contact with members of the gang and was able to describe its history and organization. The detective also investigated the instant case and recounted that a member of the gang had been convicted of selling marijuana. The detective's detailed explanation of the basis for his opinion demonstrates his knowledge that selling marijuana was one of the gang's primary activities. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323–324.) This evidence was sufficient to satisfy the primary activities element of the gang statute.

### *Cumulative Error; Ineffective Assistance*

Appellant contends the cumulative effect of the errors that took place on retrial of the section 246 charge compel a reversal of his conviction. He also claims that his trial attorney's failure to preserve any of his claims of error amounts to ineffective assistance of counsel. There is, however, no error to cumulate. Moreover, the result would have been no different if counsel had raised the now-forfeited claim that the unidentified witness statement regarding Anderson was admissible as a spontaneous declaration. Accordingly, counsel's failure to preserve the claim did not amount to ineffective assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

15

*The Gang Enhancements on the Robbery Convictions*

Appellant contends the gang enhancements on his robbery convictions must be reversed because the evidence is insufficient to support the jury's findings that the crimes were committed for the benefit and in furtherance of a criminal street gang. Reviewing the entire record in the light most favorable to the judgment and drawing all inferences the jury could reasonably have drawn from the evidence (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*)), we conclude that substantial evidence supports the jury's findings.

A finding under section 186.22, subdivision (b)(1), has two elements: (1) the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*Albillar, supra*, 51 Cal.4th at pp. 64–68.) "It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation. [Citation.]" (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) In addition, the jury may consider an expert's opinion that an offense is gang related so long as the opinion is given in response to a hypothetical question "rooted in facts shown by the evidence . . . . [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" (*Albillar, supra*, at p. 63.)

Detective Holguin opined that the robberies were committed for the benefit and in furtherance of a gang. In giving that opinion, the detective recounted the evidence indicating that appellant claimed membership not only in the 59 Hoovers, but in all cliques of the Hoover Crips. The detective also explained that clique members are allowed to commit crimes on behalf of their clique anywhere within Hoovers Crips territory. Here, both robberies were committed in broad daylight in Hoover Crips territory, and strong-arm robberies are one of the gang's primary activities. Moreover,

16

the perpetrator made no effort to disguise himself or the readily identifiable gang tattoos on his face. It could thus be inferred that the perpetrator believed his victims would be afraid to identify him out of fear for their safety. In the second robbery, he did not even bother to flee the scene but simply walked away. Before leaving his first victim, he warned her, "You better not tell the police my name."

Detective Holguin further explained that the time of day and manner in which the crimes were committed also reflect they were intended to enhance a reputation of fear and intimidation in the neighborhood. Moreover, one of the robberies involved the theft of a star pendant, which is a symbol identified with the Hoover Crips. In light of this evidence, the jury could reasonably infer that the robberies were part and parcel of the perpetrator's gang participation and were committed with the specific intent to benefit and promote the gang in furtherance of its criminal enterprise.

In arguing otherwise, appellant highlights the fact he committed the robberies by himself and notes the lack of evidence that he was wearing gang clothing, displayed gang signs, or otherwise identified himself as a gang member. These factors might be significant, were we not required to view the evidence in the light most favorable to the judgment. The cases appellant cites in support of his position are inapposite. (See *People v. Ochoa, supra,* 179 Cal.App.4th at p. 662 [crime not committed in gang's territory or rival gang's territory, and victim did not know to which gang defendant belonged]; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1361–1362 [evidence was insufficient to prove minor, who committed crime by himself, was a gang member]; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [minor charged with carrying a concealed knife while riding a bicycle in neighborhood not controlled by the gang with which he was affiliated]; *People v. Martinez* (2004) 116 Cal.App.4th 753 [gang registration requirement imposed under § 186.30 following a revocation of probation and entry of a no contest plea; no expert testimony offered]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 225-226 [gang evidence erroneously admitted to prove motive and intent in prosecution for murder and shooting at an inhabited dwelling].)

17

As our Supreme Court has recently reiterated, "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see also *Albillar, supra*, 51 Cal.4th at p. 63.) The prosecution presented such expert testimony here.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


PERREN, J.

We concur:


GILBERT, P. J.


YEGAN, J.


18

John S. Fisher, Judge

Superior Court County of Los Angeles

_____

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Dana M. Ali, Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.