[No. B184288. Second Dist., Div. Six. Mar. 26, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCOS A. ZURINAGA et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to rules 8.1105 and 8.1110 of the California Rules of Court, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, i.e., [[/]].

## COUNSEL

Jason K. Feldman for Defendants and Appellants.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PERREN, J.**—In his closing argument to the jury, the prosecutor in this case equated the terrible events of 9/11 to appellants' home invasion robbery of nine college students in their residence hall. He then displayed a chart listing the flight numbers and airliners downed on that day as well as the numbers of passengers and crew who died. He discussed the victims' telephone calls to "loved ones." He argued it was his duty to "transport" the jurors to the crime scene so that they could feel the "terror" the victims experienced.

"Like the Hydra slain by Hercules, prosecutorial misconduct has many heads." (*United States v. Williams* (1992) 504 U.S. 36, 60 [118 L.Ed.2d 352, 112 S.Ct. 1735] (dis. opn. of Stevens, J.).) Regrettably, Hercules was far more successful than have been the federal and state courts in controlling it. In 1935 Justice Sutherland iterated his oft-quoted admonition: "The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of

a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (*Berger v. United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 55 S.Ct. 629].)

Our search of Westlaw discloses that in the 70-plus years that have passed since *Berger* was decided, the principle has been reiterated thousands of times in cases issued in the courts of appeal throughout the land. In this case, we confront the frustration felt by the majority of those courts: Though we strongly disapprove of the prosecutor's conduct, we are unable to conclude that it "so infected the trial with unfairness as to make [appellants'] conviction[s] a denial of due process." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

### *The Prosecution's Case*

On September 19, 2002, appellants Marcos A. Zurinaga and Jared M. Villery committed a home invasion robbery at a duplex on Pershing Street in Playa Del Rey where several Loyola Marymount University (LMU) students resided. Approximately 10:30 p.m., appellants entered unit B through the unlocked front door and encountered Randall Marsh, Robb Monkman, Peter Wells, Jonathan Hughes, Kris Maddox, Dave Manzur, and Chris Ryden in the living room.[1] Zurinaga wielded a samurai sword, and Villery held a semiautomatic pistol with a silencer attached to the barrel.

Appellants locked the door and ordered the occupants to sit on one of the couches in the living room, empty their pockets, and give them anything of value such as their wallets and watches. After the occupants' valuables were collected, Villery asked Peter Wells to identify himself. After Wells did so,

---

[1] Marsh, Monkman, Wells and Hughes were residents of unit B.

Villery ordered him at gunpoint to his upstairs bedroom. Villery placed several of Wells's belongings into a duffel bag, then ordered Wells to accompany him to the other two upstairs bedrooms. Villery took various items, including two laptop computers, a DVD player, two CD players, an MP3 player, and a game console. When the duffel bag was full, Villery took Wells back downstairs. He then took Monkman upstairs for about five minutes.

After Villery and Monkman returned to the living room, one of the appellants asked if "Will" was home. Marsh indicated that Will Nelson, who lived in unit A, was not home. Appellants asked if anyone knew how to get into Nelson's apartment, and Marsh told them he knew where the doors were. Villery led Marsh next door at gunpoint. Marsh attempted to open the sliding glass door, but it was locked. Villery put the gun to Marsh's back and ordered him to punch out an adjacent window.

After Villery and Marsh returned to unit B, appellants exchanged their weapons. Villery grabbed Hughes and took him to unit A. At Villery's command, Hughes filled a bag with several items from the apartment. Villery took a decorative sword that was hanging on the wall in one of the bedrooms. Villery also took Hughes upstairs, where Stuart Purdy was found sleeping in his bedroom. Purdy testified that Villery pointed a butcher knife from the kitchen at him and told him not to "try anything." Villery then took several items from the room, including Purdy's MP3 player and about $30 in cash, and placed them in a bag. After several bags had been filled with items from all four bedrooms, Villery ordered Hughes and Purdy back to unit B.

In the meantime, Zurinaga ordered the occupants to put various consumer electronics into a duffel bag, including a camcorder, PlayStation, and approximately 40 DVD's. Villery eventually returned with Hughes and Purdy and ordered them to sit with the others.

Approximately 11:30 p.m., Julie Maggio and Peter Hoffman arrived at the duplex in Maggio's car to pick up Hughes, who was Maggio's boyfriend. Hoffman waited in the car while Maggio went up to the door and knocked. Zurinaga answered the door and told Maggio to join the others in the living room. When Maggio had not returned about 10 minutes later, Hoffman got out of the car and knocked on the door. Hoffman testified that one of the appellants pointed a gun in his face, pulled him into the apartment, patted him down, and ordered him to stand by a wall. One of the appellants took about $6 from Hoffman's pockets.

Sometime later, Thomas McGuire walked over to unit B from the LMU library to visit his friends. Zurinaga opened the door, and Villery ordered McGuire to get on his knees and empty his pockets. Appellants took his wallet, cell phone, and $40 from his pocket. The cell phone was later returned to him.

As appellants prepared to leave, one of them took the driver's licenses from the victims' wallets and told the victims to write down their personal information. Appellants told the victims they would be killed if they called the police. Appellants also said they had a bullet for each of the male victims. Appellants taped Ryan's hands, blindfolded him with a T-shirt, loaded the bags onto his shoulders, and led him at gunpoint to their car.

Appellants drove away, leaving Ryan standing in the street. The victims left the apartment and went to Hoffman's house in Westchester. They discussed whether to call the police. Some were afraid because of the threat on their lives. Fifteen to 30 minutes later, one of them made the call and the police arrived shortly thereafter.

Approximately 11:45 p.m., Nelson and Swanson returned to unit A, where Nelson discovered that some of his belongings were missing, including electronic equipment, luggage, and a few knives. Brown's laptop and speakers were also gone, and a sword that had been mounted on the wall was missing.

Nearly a year later, on August 29, 2003, Hughes recognized Villery at a toga party for LMU students. Hughes told several other victims who also happened to be at the party that he had seen Villery. When the police arrived to break up the party, Monkman and others told the police that Villery had robbed them and he was taken into custody. Hughes, Monkman, and Marsh all positively identified Villery as one of the robbers. McGuire subsequently identified both Villery and Zurinaga from a "six-pack" photographic lineup, while Marsh and Monkman identified Zurinaga, and Purdy and Wells identified Villery. Zurinaga was arrested at his home on October 24, 2003.

*The Defense*

Villery testified that he and Zurinaga went to the apartment on September 19, 2002, in order to sell fake marijuana. According to Villery, the day before he had called someone he knew only as "Pete" and arranged to bring the marijuana to Pete's apartment the following evening. Pete said that his

friends and roommates had "chipped in" money for the marijuana. When appellants arrived at the apartment, Pete identified himself and handed Villery $4,000 in cash. Villery gave Pete what appeared to be a pound of marijuana in a sealed bag. Because the buyers wanted to try the marijuana before appellants left, Villery gave them some real marijuana he had brought with him. After Villery and other people at the apartment smoked the marijuana for about half an hour, appellants left with the money.

### The Verdict and Judgment

The jury found both appellants guilty on seven counts of false imprisonment by violence or menace (Pen. Code,[2] § 236), two counts of first degree robbery (§ 211), two counts of first degree attempted robbery (§§ 211, 664), and one count of first degree burglary (§ 459). The jury also found true allegations that appellants personally used a deadly weapon or a firearm in committing the offenses (§§ 12022, subd. (b)(1), 12022.53, subd. (b)), and that another person was present during the commission of the burglary (§ 667.5, subd. (c)(21)). Appellants' motions for a new trial on the ground of prosecutorial misconduct were denied. The trial court sentenced Zurinaga to a state prison term of 22 years and Villery to a state prison term of 28 years four months.

### DISCUSSION

### I.

### Prosecutorial Misconduct

### A.

In his opening statement made before the presentation of any evidence, Zurinaga's attorney stated: "There are roughly ten witnesses that you heard described. Nine of them were men. As you see them brought in here, you'll see that they're all of a size larger than [appellants]. [¶] This incident that as described should have taken roughly 15 or 20 minutes took over two hours. [¶] During that two hours, these individuals had numerous opportunit[ies] to escape. No one resisted. In fact, you will hear an account that one of the

---

[2] Statutory references are to the Penal Code, unless otherwise noted.

supposed weapons was dropped." In his closing argument at the end of the trial, counsel posited: "Whoever heard of a robbery or a burglary or whatever the prosecution is trying to call it that took two hours where nobody was hurt, where nothing of significance was taken, where the so-called invaders were outmanned and outsized."

In response, the prosecutor projected a chart listing the airlines, flight numbers, time of departure, and the number of passengers and crew on each of the planes involved in the terrorist attacks of September 11, 2001. The prosecutor then told the jury: "Counsel's statement was these two men were outmanned, outsized. What are these[?] These are the four airliners that were high jacked [*sic*] on September 11, 2001. . . . [¶] American Airlines Flight 11, 81 passengers and crew; United Airlines flight 175, 56 passengers and crew; American Airlines 77, 58 passengers and crew; United Airlines flight 93, 38 passengers and crew. [¶] Did those three airliners, four—there were five men. I don't remember. One of them only had four men."

At that point, the parties approached the bench. Villery's attorney stated, "I don't mind him analogizing, but to go into things that I didn't go into such as airliners and passengers and crew members and to give a proportion and say that these people could have avoided this tragedy and analogize it to this case is improper." After noting that Villery's attorney had referred to facts not in evidence during his closing argument regarding his and his wife's roles as victims in a home invasion robbery, the court stated that the analogy was "appropriate" because the defense had disputed "[t]he fact that a few people can hold a number of people hostage." Villery's attorney then "ask[ed] for a mistrial based upon that ruling because at this point in our nation's history [the prosecutor] is analogizing this case to somebody that is trapped in an airplane high in the sky. [¶] This is not even a proper analogy. This is appealing to the emotions of the jury in regard to a national disaster and analogizing it to a residential robbery. [¶] It's not analogous. These people were not in airplanes. They were not flying. One could easily take advantage of the position they're in in an airplane by the mere fact that it's in the air. [¶] They are trapped anyhow. So it's a whole different ball game. If this jury—if he's appealing to the sympathies of this jury because of a national tragedy and trying to analogize that to these defendants, I think I have no other recourse but to ask for a mistrial."

Zurinaga's attorney joined in the mistrial motion, and added that the prosecutor "could have made a quick analogy, and while it would have been objectionable, he could have done it. [¶] Now there has been a period of time and a document which has dates, times of these incidents. It's completely inappropriate." The court responded that "the document is on the blue screen because counsel asked to approach. It is nothing that Mr. Lamb did to leave

that there. [¶] . . . Again, I find that throughout this trial a lot of emphasis has been put on the fact that two men held hostage a large number of individuals in a small location, the inference being, indeed direct questioning to the point, why didn't you just start a takeover. [¶] I think this is a proper analogy. So the motion for a mistrial is denied."

Villery's attorney responded that "[a]t this point, if you're not going to declare a mistrial, I'm going to ask that no more be said about our national tragedy and the statistics involved in it. It's not in evidence." Zurinaga's attorney joined in that request, and the court responded, "[t]here is nothing in evidence about your own personal experience." Villery's counsel noted that the prosecutor had not objected to his comments, and the court responded, "That's correct. He did not object. I don't believe it's proper for you to say that, to me this happened this way, and this is the way these types of things occur, and if they don't occur in two hours, et cetera, et cetera. [¶] The motion for a mistrial is denied. I will permit him now to make his point and move on."

The proceedings were resumed in open court and the prosecutor continued: "One person took over the cockpit. Four men stayed behind keeping 81, 56, 58 passengers hostage. What weapon did these men use. Box cutters. . . . Four men versus 81, 56, 58. That's what happened. [¶] So to say why, as counsel argued, these people were—what was the word—I wrote it down. Anyway, they were superior in numbers, strength, size; but of these four airliners on only one of them did the passengers rise up, and that was the last one when they had apparently been calling their loved ones, calling emergency numbers, and learned what happened to the other planes. [¶] In this case these people were going along to get along. There was a promise that we're just here for business, and that's what they wanted. . . . [¶] . . . Now, my job is to transport you, take you from this courtroom and transport you to 8301 Pershing, units A and B, on September 19, 2002. [¶] I have no video of the event. I just have the recollections of the witnesses, some photographs that were taken . . . , a couple things that were taken into evidence by the officers, and that's about it. [¶] The courtroom is a sterile environment. It's removed, unfortunately, from the terror that those people felt that night . . . ."

After the jury returned its verdicts, appellants moved for a new trial on the ground of prosecutorial misconduct based on the prosecutor's comments. Counsel noted that "[t]his was . . . not just an aside or an analogy that was made during argument. This was a prolonged argument involving visual aids and statistics without foundation that were clearly facts not admitted into evidence. [¶] I don't think it would be possible to come up with a more emotional topic or example or circumstance for the jury pool and also something that's more universal to the American people and the jury pool

that was present here than the 9-11-01 incident." The prosecutor responded, "it was proper rebuttal drawing from a well-known event in history. [¶] Counsel says I analogized these two men to high jackers [*sic*]. Well, in a sense they were high jackers [*sic*]. They high jacked [*sic*] about a dozen people during the course of this incident." He also noted that approximately three and a half years had transpired since the 9/11 incident, and "submit[ted] that all of the shock of this incident has dissipated. . . . [¶] I don't believe that this is the subject of shock, and what I presented was not in fact presented in any shocking way. [¶] It was an analogy to show that human behavior is what it is and to explain in a way that the jury ought to understand why a dozen people did not rise up and take over when confronted by two armed men. . . . [¶] . . . I believe that it was proper rebuttal, and I believe that the jury was not inflamed by it just simply based on, among other things, there appeared to be no gasps from the jury. [¶] . . . I didn't see anyone do anything that would indicate an inflammatory process was occurring." Zurinaga's attorney responded that one of the juror's "expression changed" when the prosecutor starting referring to 9/11 and that "several of the jurors just turn[ed] and look[ed] to me and co-counsel as if to say, is that okay? Is there going to be some response from defense counsel? [¶] They knew something was wrong with that argument. . . . [¶] I don't think any American person looks at an airplane flying in the air the same way. . . . [¶] I think it's still very much on the surface especially considering that our troops are overseas at war based upon that very incident."

The court concluded: "[The prosecutor's] argument came during rebuttal. It was very brief. It began with a sentence or two before we had our sidebar conference where you raised your objections. . . . [¶] Once I ruled on th[e] motion at sidebar, he returned to it very briefly, summed it up, did point out that in one of the situations the passengers did rise up, and he finished his argument by indicating that the people, in reference to the victims in this particular case, were going along to get along. [¶] I found then, as I indicated to you at sidebar, that throughout the trial a lot of emphasis was put on the fact that the defendants held hostage a large number of individuals in a small location, the inference being, . . . why didn't the victims just start a takeover since they outnumbered the defendants. . . . [¶] The fact that a few people could hold a larger number of people hostage—I think it was an appropriate illustration. [¶] It was a matter of common knowledge. It was a vigorous argument. I don't find it appealed to the sympathy of the jury, and it was brief and to the point. [¶] So your motion for a new trial will be denied."

## B.

Appellants argue as they did below that the prosecutor's reference to the 9/11 incident amounted to prejudicial misconduct.[3] The People respond that the prosecutor's reference was brief, based on common knowledge, and within the permissible range of argument in that it was directly responsive to the defense theory that appellants could not have held 10 people hostage for an extended period of time.

██ "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11].)

██ "It is the duty of every member of the bar to 'maintain the respect due to the courts' and to 'abstain from all offensive personality.' [Citation.] A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the State. [Citation.] As the United States Supreme Court has explained, the prosecutor represents 'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' (*Berger v. United States*[, *supra*,] 295 U.S. [at p.] 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) Prosecutors who engage in . . . intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve. [Citations.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 819–820 [12 Cal.Rptr.2d 682, 838 P.2d 204]; see also *People v. Hill* (1998) 17 Cal.4th 800, 819–820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Even accounting for the fact that prosecutors are afforded wide latitude during closing argument (see *People v. Wharton* (1991) 53 Cal.3d 522, 567

---

[3] A review of the court's ruling on appellants' motion for new trial belies their contention that the ruling was based on "vindictiveness" in that it was intended to "punish[] the Appellants by admitting improper argument in retribution for the judge's perceived improper use of personal experience in argument by Villery's counsel."

[280 Cal.Rptr. 631, 809 P.2d 290]), we agree with appellants that the prosecutor's comments regarding 9/11 crossed the line and constituted misconduct. Contrary to the trial court's assessment, the prosecutor's reference to the 9/11 incident was not brief. Had the trial court sustained defense counsel's objections our discussion about the prosecutor's unseemly argument would be unnecessary. We endorse the view that trial courts should refrain from unwarranted interference in a trial. But here the trial court had a responsibility to prevent the prosecutor's inflammatory argument. Indeed, emboldened by the trial judge's ruling the prosecutor continued to refer to the incident. He presented the jury with a list of the airlines, flight numbers, departure times, and number of passengers and crew on each plane involved in that incident.

■ It is well settled that it is "clearly misconduct" for a prosecutor to make arguments based on facts not in evidence that are not matters of common knowledge. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571]; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1026 [108 Cal.Rptr.2d 291, 25 P.3d 519].) "[S]uch statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." [Citations.]' [Citations.] 'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' [Citation.]" (*People v. Hill, supra,* 17 Cal.4th at pp. 827–828.) Although the 9/11 incident itself is undoubtedly a matter of common knowledge, the specific information the prosecutor presented regarding the airlines, flight numbers, and numbers of passengers and crew is not. It is also noteworthy that the prosecutor did not show his visual aid to opposing counsel or the court before presenting it to the jury.

Moreover, the prosecutor's analogy to 9/11 was inapt. Appellants did not merely argue, as the prosecutor claimed and the court found, that it was unlikely two armed men such as themselves could hold a larger group hostage. Though counsel referred to the fact that appellants were "outmanned and outsized" by their victims, that statement was made in the context of arguing the unlikelihood that appellants could have held their victims captive for almost two hours without one of the victims *attempting an escape.* Obviously, none of the 9/11 victims had any opportunity to escape their captors. Moreover, we will never know whether or to what extent they were aware of their fate or made efforts to overpower the highjackers.

We also consider it naïve at best—and disingenuous at worst—to suggest, as the prosecutor did, that the mere mention of 9/11 does not continue to

invoke fear, dread and anger in the listener. As defense counsel aptly noted, "I don't think it would be possible to come up with a more emotional topic or example or circumstance for the jury pool and also something that's more universal to the American people and the jury pool that was present here than the 9-11-01 incident." Given the ongoing sensitivity of the subject matter, prosecutors who undertake to inject those facts into a case must use caution. The tactics employed by the prosecutor in this case, which included a visual aid, accompanied by an argument that it is impossible to imagine the "terror" that the victims in this case suffered as a result of appellants' crimes, were simply beyond the pale. By analogizing to the 9/11 victims' plight, the prosecutor improperly sought to place the jury in their shoes. (See, e.g., *People v. Fields* (1983) 35 Cal.3d 329, 362 [197 Cal.Rptr. 803, 673 P.2d 680].) This is the sort of "foul blow" that exceeds the legitimate bounds of advocacy. (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 241 [21 Cal.Rptr.3d 160].) Moreover, the prosecutor's conduct cannot be justified on the ground that the trial court allowed it.

█ As egregious as the prosecutor's conduct was, however, we must conclude that appellants were not prejudiced by it. As defense counsel noted, some of the jurors actually appeared to be *offended* by the prosecutor's reference to 9/11. Moreover, the jurors were instructed that counsel's arguments were not evidence, and that they should not be influenced by sympathy for the victims in reaching their verdict. We presume that the jury followed these instructions. (*People v. Perry* (1972) 7 Cal.3d 756, 791 [103 Cal.Rptr. 161, 499 P.2d 129], overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 28–34 [164 Cal.Rptr. 1, 609 P.2d 468].) Of greatest significance, however, the evidence of appellants' guilt in this case was overwhelming, so it is not reasonably probable that appellants would have achieved a more favorable result absent the misconduct. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Accordingly, the error flowing from that misconduct was harmless. (*Ibid.*; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

[[/]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1248.

## DISPOSITION

The judgments are affirmed.

Gilbert, P. J., and Coffee, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 11, 2007, S152367.