Filed 1/22/16  P. v. Murphy CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHARLES ANTHONY MURPHY, JR.,<br><br>    Defendant and Appellant. | G049716<br><br>(Super. Ct. No. 07NF2178)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

In February of 2010, the Orange County District Attorney charged Charles Anthony Murphy, Jr., Iftekhar Murtaza, and Vitaliy Krasnoperov with two counts of special circumstance murder.[1]  After two mistrials, a third jury convicted Murphy of both counts and found true special-circumstance allegations of murder committed during a kidnapping and murder for financial gain committed during a burglary.  The court sentenced Murphy to life in prison without the possibility of parole.

Murphy challenges the sufficiency of the evidence to prove his identity as one of the perpetrators of the murders.  He also argues the prosecutor committed prejudicial misconduct during closing argument.  We find neither argument persuasive and affirm the judgment.

**FACTS**

*1.  Prosecution Evidence*

  *a.  Background*

In 2005, Shayona Dhanak,[2] who was 15 at the time, started a relationship with 19-year-old Murtaza.  Through Murtaza, Shayona met Krasnoperov.  Although she never met Murphy, Shayona said Murtaza had talked about him.  Murphy was Murtaza's childhood friend.

In 2006, Murtaza, who lived in the San Fernando Valley, spoke to several people, including Murphy, about coming to work for him at his mortgage loan company.  That summer, Shayona broke up with Murtaza, but two weeks later, Murtaza lied and said he had been injured in a car accident.  Then, in the fall of 2006, Shayona started her freshman year at the University of California, Irvine.  She lived in her dorm room during

---

[1]  See (*People v. Krasnoperov* (Jan. 15, 2015, G047719) [nonpub. opn.]).

[2]  We refer to members of the Dhanak family by first name for clarity and intend no disrespect.

the week and with her parents, Jayprakash (Jay) and Leela Dhanak, and her sister, Karishma, in the family home in Anaheim Hills, near Eucalyptus Park.

By February 2007, Shayona had decided to completely break away from Murtaza. Her parents were devout Hindus and they were not pleased Murtaza was Muslim. Nevertheless, Murtaza continued to have contact with her.

On March 28, Shayona and Murtaza went to dinner and talked for two hours in his car in front of her parents' home. Shayona broke up with Murtaza, and she returned a cell phone he had given her. Shayona thought Murtaza seemed fine and they agreed to remain on good terms.

On March 29 at about 3:21 a.m., Krasnoperov and Murtaza engaged in the following colloquy through AOL Instant Messenger:[3]

> "[Murtaza]: yo man..
>
> "[Murtaza]: shayona's parents made us break up
>
> "[Krasnoperov]: wtf?
>
> "[Murtaza]: dude, I want to kill them
>
> "[Krasnoperov]: how?
>
> "[Murtaza]: this is fucked
>
> "[Krasnoperov]: not kill them...
>
> "[Kransnoperov]: how did they make her break up with you
>
> "[Murtaza]: they makin her pick
>
> "[Murtaza]: ..
>
> "[Murtaza]: i was over there
>
> "[Murtaza]: right now
>
> "[Murtaza]: talkin to her

---

[3] Police seized the defendants' computers and electronic devices. From the computers, experts collected data on Internet searches, e-mail, and instant messaging services.

"[¶] . . . [¶]

"[Krasnoperov]:  oh shit

"[Murtaza]:  her parents forced her…

"[Krasnoperov]:  hokay fool, if you kill them now…

"[Krasnoperov]:  it's gonna b obvious

"[Krasnoperov]:  you gotta wait

"[Murtaza]:  …

"[Krasnoperov]:  If I could've helped you I would've by now

"[Murtaza]:  her parents told her to say she cheated on me

"[Kransnoperov]  unless u want to do that shit urself

"[Murtaza]:  to have us break up

"[Krasnoperov]:  that's reatarded

"[Krasnoperov]:  retarded*

"[Murtaza]:  i dont know how to kill them

"[Krasnoperov]:  I don't know either…

"[Krasnoperov]:  burn the house down…

"[Murtaza]:  we can?

"[Krasnoperov]:  hit and run

"[Murtaza]:  with them in it

"[Krasnoperov]:  ur upset right now

"[Krasnoperov]:  u gotta wait to make this kind of decision

"[Krasnoperov]:  I mean, we're not professional killers

"[Krasnoperov]:  probably better if we hire someone

"[Krasnoperov]:  nigga

"[Murtaza]:  yeah i want to

"[Murtaza]:  im sick of crying dawg

"[Murtaza]:  this is fuckin gayyy

4

"[Krasnoperov]:  yeah, that sucks, man

"[Krasnoperov]:  u think maybe harry knows someone?

"[Murtaza]:  maybe…

"[Krasnoperov]:  he might, I'll ask him… I tried calling him today

"[Krasnoperov]:  he didn't answer

"[Krasnoperov]:  don't trip though, shayona will come around

"[Krasnoperov]:  I mean either way

"[Murtaza]:  im down to do it myself w ith proper gear

"[Krasnoperov]:  she knows you guys are good together

"[Murtaza]:  …………….

"[Krasnoperov]:  proper gear

"[Krasnoperov]:  I dont even know what that is

"[Murtaza]:  guns n shit

"[Murtaza]:  mask I guess

"[Krasnoperov]:  fool it'll b obvious

"[Murtaza]:  but either way it's good to have someone do it

"[Krasnoperov]:  like CRAZY

"[Krasnoperov]:  we gotta make it look like an accident

"[Murtaza]:  how do we do that>

"[Krasnoperov]:  easiest way to do is to go to mexico and buy a sniper rifle

"[Krasnoperov]:  do it from far away

"[Krasnoperov]:  easy to get away too

"[Murtaza]:  are you drunk?

"[Krasnoperov]:  no, man

"[Krasnoperov]:  otherwise u gotta do it up close

"[Murtaza]:  okay then.

"[Krasnoperov]:  hard to get away

5

"[Murtaza]:  lets do it…

"[Krasnoperov]:  and have witnesses

"[Krasnoperov]:  get a run down van

"[Murtaza]:  wat witnesses if we ran into their house

"[Krasnoperov]:  but I still think we should hire

"[Murtaza]:  n kill them with a s

"[Murtaza]:  ilencerr..

"[Murtaza]:  silencerr

"[Krasnoperov]:  u dotn think shay will think it's you?

"[Murtaza]:  nahh

"[Murtaza]:  We ll have a story with it

"[Krasnoperov]:  I dunno man…

"[Murtaza]:  legitone.

"[Krasnoperov]:  smoking people . . . on our own

"[Murtaza]:  her parents have haters

"[Murtaza]:   n I know stories

"[Krasnoperov]:  blowing up their house?

"[Krasnoperov]:  I'm trying to think of the best way to do it

"[Murtaza]:  I dont know which is safer?

"[Murtaza]:  blowing up if they are in there

"[Krasnoperov]:  Let me find out if Harry knows someone

"[Murtaza]:  But that's not an accident.

"[Krasnoperov]:  I also know these russian in Tarzana that used to do this kind of stuff, but I lost contact with them

"[Murtaza]:  yeah, man i thought everything was perfect

"[Krasnoperov]:  I know a girl

"[Krasnoperov]:  hold on

6

"[Murtaza]:  after dland

"[Murtaza]:  n then this happens…

"[Krasnoperov]:  Let me txt her

"[Murtaza]:  okay

"[Krasnoperov]:  she knows their numbers

"[Krasnoperov ]:  or at least where they hang out

"[Murtaza]:  this is so gay …….y r her rents so fucked up

"[Murtaza]:  oh they do..

"[Krasnoperov]:  what about the conversion thing

"[Krasnoperov]:  that didnt work?

"[Murtaza]:  nah her rents won't care…

"[Murtaza]:  she said

"[Murtaza]:  it's valuable to her thpo

"[Murtaza]:  tho*

"[Murtaza]:  i really have to do this . . .

"[Murtaza]:  theres like no other wayyy

"[Krasnoperov]:  yeah

"[Murtaza]:  If u aint on the phone juss call me."

Nine minutes later, Krasnoperov texted Elena Kokorina, a friend he met in high school.

In mid-April, Murtaza appeared uninvited at a fundraiser for Shayona's dance team.  He caused a ruckus by punching one of Shayona's dance partners and chasing her into her dorm room.  A few days later, on April 25, Murtaza used AOL Instant Messenger to engage Krasnoperov in the following discussion:

"[Murtaza]:  am going with u 2mm??

"[Krasnoperov]:  not sure yet

"[Krasnoperov]:  He said sometime after 2

7

"[Krasnoperov]: Not 100%

"[Murtaza]: Aiight

"[Murtaza]: let me know i guess

"[Murtaza]: [crossing fingers emoticon] . . . gnite. im goin ridin for a bit

"[Krasnoperov]: Aight

"[Murtaza]: I am away from my computer right now

"[Krasnoperov]: gnite

"[Krasnoperov]: :-*

"[Krasnoperov]: I'll know tomor

"[Krasnoperov]: I think

"[Krasnoperov]: he said he wants

"[Krasnoperov]: details

"[Krasnoperov]: so text her address

"[Krasnoperov]: or way

"[Krasnoperov]: wait

"[Krasnoperov]: I'll get it from u

"[Murtaza]: take me with you?

"[Krasnoperov]: dont txt

"[Murtaza]: aight

"[Murtaza]: wateveru feel is chill

"[Krasnoperov]: I dunno if u want

"[Krasnoperov]: that

"[Krasnoperov]: I'll let u know

"[Krasnoperov]: if we want that

"[Murtaza]: okay

"[Murtaza]: justdont wanna get robbed

"[Murtaza]: esp during all this other money ihad to pay

8

"[Murtaza]: had to pay a SHITloadof taxes

"[Krasnoperov]: yeah

"[Krasnoperov]: okay man

"[Krasnoperov]: if they see that ur

"[Krasnoperov]: Indian

"[Krasnoperov]: I would think

"[Murtaza]: lolwat

"[Murtaza]: ?

"[Krasnoperov]: they'd rip u

"[Krasnoperov]: I duno

"[Murtaza]: oh

"[Krasnoperov]: ur are welcome to come

"[Krasnoperov]: but

"[Murtaza]: ya no

"[Murtaza]: they ur peepz

"[Krasnoperov]: I'll ask

"[Krasnoperov]: I made it seem like a russian thing

"[Murtaza]: id rather have em think they doinit for same c country

"[Krasnoperov]: might needs pictures

"[Murtaza]: aka = you

"[Krasnoperov]: of all them

"[Krasnoperov]: n shit

"[Murtaza]: you serious?  Fuck

"[Murtaza]: might have mom

"[Murtaza]: and sister

"[Murtaza]: of course

"[Murtaza]: how to get pics??

9

"[Murtaza]: of em

"[Murtaza]: illaskher to show me pics of her indiatrip I guess

"[Murtaza]: let me know when we need pics..cuzi havetobe slick aboutit

"[Krasnoperov]: asap

"[Krasnoperov]: getem

"[Murtaza]: aiight."

The following day, April 26, Murtaza contacted Shayona through AOL Instant Messenger. Murtaza told Shayona he was waiting for a conference call and he wanted to look at some pictures of her family. Shayona sent family photographs from a recent trip to India. A few minutes after this conversation, Krasnoperov and Murtaza had a telephone conversation via landline that lasted just under one hour.

Murtaza and Shayona did not see each other again until May 18. They had lunch the following day, and Murtaza told Shayona he wanted to work things out with her parents. Shayona said no, and she told Murtaza she had a date for a dance that night.

On May 19, using cell phone data,[4] Murphy and Murtaza were traced to various locations in Newport Beach and Irvine. The next morning, Shayona posted several pictures from the dance on her Facebook page, and the following day, May 21, she started to receive a number of calls from Murtaza, which she blocked.

Murtaza eventually got through and talked to Shayona. Shayona testified Murtaza was confrontational, and that he repeatedly asked her questions about the man who had accompanied her to the dance. Shayona told Murtaza she had another date in a little while, which started another round of angry questioning.

Shortly after his tense conversation with Shayona, Murtaza engaged Murphy in the following text exchange:

---

[4] Jim Cook, a wireless industry expert, analyzed call detail records and carrier information. Cook was able to plot the movement of Murphy's and Murtaza's cell phones as the phones contacted different cell towers in various locations.

"[Murtaza:]  Yo call me.  This is important.

"[Murphy:]  I will call you

"[Murphy:]  Wats good?

"[Murtaza:]  Sum1 offerin 30k for a job. . i dnt kno how down u r

"[Murphy:]  What do I do?

"[Murtaza:]  Gotta talk in person. . .it's a big deal. . .im doin it myself

"[Murphy:]  Okay, come get me . . . Come 2 my house . . . I'm at home."

Around 2:00 p.m., on May 21, Murtaza called Jose Velasco,[5] a former employee of Murtaza's company, and asked him to be an alibi.  He also called Murphy and Murphy returned his call.  Murtaza drove from his house in Van Nuys to Murphy's home in Mission Hills, a distance of about five or six miles.  During the drive, Murtaza called another friend, Timothy Coronado, to cancel their gym date.

About 2:40 p.m., Murphy and Murtaza's cell phones left the vicinity of Murphy's home and headed toward Murtaza's home.  Once at Murtaza's house, someone used Murtaza's computer to research the word, "Dhanak," "what race is the name Dhanak," "Background of Dhanak," and "Leela Dhanak."  As a result, this person discovered an article about a postal fraud case involving Jay and Leela.  Jay had pled guilty to one count of mail fraud and he spent some time in custody.

Around 6:30 p.m., Murphy and Murtaza returned to Murphy's house, and at around 7:00 p.m., Murtaza texted Shayona, "Have fun on your date."

b.  *The Crimes*

About the same time Murtaza sent Shayona his good wishes, Jay left Leela at her business in Irvine to take her car in for service.  He got a ride home from, Ami Mehta, one of Karishma's friends.  Karishma and Mehta left Jay at home and went to

---

[5]  Velasco also testified under a grant of immunity.

11

celebrate a friend's birthday, but they returned around 8:00 p.m. Jay was sitting on the couch watching television when they left the house, again, a few minutes later.

At around 10:00 p.m., Mehta drove Karishma home. As Karishma got out of Mehta's car, she said, "Oh, that's weird. The lights are off." Mehta watched Karishma go into the front door of the house and then drove away.

Leela arrived home about thirty minutes later. She had called Jay using their landline several times but received no answer. Leela noticed two unusual circumstances. Jay's car was not parked in its usual spot, and their house was dark.

Leela entered the house through the garage. When she turned on a light, Leela immediately saw Jay standing near the kitchen sink and bleeding profusely. Leela ran toward Jay, but as she did, two men came out of the dark living room and attacked her. Leela recognized Murtaza as one of her attackers. Murtaza slit her throat while the other man held her in place. Leela remembered being hit on the head and falling to the ground.

At the time, Ryan Sieloff and his girlfriend were at Eucalyptus Park nearby. They watched a light colored minivan slowly drive up and down the street where the Dhanaks lived, and a short time later, Sieloff noticed the Dhanak home was on fire. Sieloff saw the light colored minivan now parked near the front of the Dhanak's house. It was running and facing the wrong direction, and there was a woman lying in the Dhanak's neighbor's driveway. Sieloff also saw one man straddling and beating another man with a small baseball bat.

When Sieloff and his girlfriend got to the Dhanak's home, Leela was lying in the neighbor's driveway, covered in blood, and she appeared to be dead. Jay, Karishma, and Shayona were nowhere to be found.

c. *Murphy and Murtaza's Movements*

At around 8:30 p.m., on the day of the crimes, Murphy checked his voicemail using a cell phone tower located three-quarters of a mile from the Dhanak

home. Over the next approximately four hours he ignored 16 incoming calls, which was unusual for him. Around 9:30 p.m., Murtaza answered a call on his cell phone utilizing a cell tower near the Dhanak home. By about 1:00 a.m. on May 22, Murphy and Murtaza were in Van Nuys according to cell phone records.

Around 4:00 a.m., a gate attendant at Concordia University noticed a fire on a nearby bike path and reported it to police. A responding police officer soon found the charred remains of Jay and Karishma. Jay died from blunt force trauma to his head, but he had also been stabbed 29 times and set on fire postmortem. Karishma also suffered blunt force trauma to the head. However, she died either from exsanguination due to a slashed jugular vein, or from burn injuries suffered before she died. Leela suffered a slash wound to her throat, five stab wounds to her stomach, and burns on her forearms and feet. She was in a coma for several weeks after the attack.

By 7:30 a.m., Murphy and Murtaza's cell phones were in their respective homes. Between 7:54 a.m. and 8:53 a.m., Murphy used his home landline to call Murtaza while he also used his cell phone to make other calls.

### d. The Aftermath

In the early morning hours of May 24, Murphy and Murtaza exchanged the following instant messages: "[Murphy:] Aye, Wat u doing?" Murtaza replied, "Hey. Nuthin. Chillin. U?" Murphy responded, "Nuthin., U get my stuff" Murtaza replied, "Nope, my dad threw everything away." Murphy asked, "Y," to which Murtaza responded, "why do you think? Nm don't say it. LOL." Murphy replied, "Lol," and Murtaza closed with, "Haha."

Around 5:00 p.m. that day, Murtaza went to the Anaheim Police Station. A detective interviewed him while another officer attached a tracking device to his car. The following morning, Murtaza's car was found in Phoenix, Arizona. Murtaza was arrested at the airport with $11,000 in cash and a one-way ticket to Bangladesh.

13

In June, Murtaza's father exchanged his tan, 2004 Honda Odyssey van for a 2007 model. When investigators located the Murtaza's 2004 Odyssey, the headrests and middle seat were missing. There were also traces of Jay's and Karishma's blood throughout the car.

On August 2, police officers searched Murphy's home and seized his cell phone and computers. Several days later, during an interview with a detective, Murphy said he was employed at an Adidas store, although he had not worked since May, and that he attended Concordia University. According to Murphy, he and Murtaza have been friends since middle school. Murphy told the detective that he knew Murtaza had been arrested for murder, but Murphy said he had not seen Murtaza since mid-May. Upon further questioning, Murphy admitted he and Murtaza had been together after mid-May. However, he asserted they met some girls at a club one time. The officer asked if Murphy had any telephone conversations with Murtaza in May. Murphy said he did not think so, but if he had talked to Murtaza, it would have been about the girls they had met.

Murphy repeatedly denied having any contact with Murtaza. He told the detective that he went to his sister's home in Lancaster on May 20, and he stayed there until the morning of May 22. He remembered this because his mother called the morning of May 22 to let him know there was a fire near Concordia University. He specifically denied being in Anaheim on May 21 or 22. He also denied knowing Murtaza's girlfriend. In fact, he told the detective, "I thought they were still together."

*e. Other Evidence*

Murtaza talked to several people about his desire to kill Shayona's family in the weeks preceding the crimes. He told one friend, Misbah Dammanwalla, several times that he wanted to kill Shayona's parents so she would be forced to return to him. And, after the murders, Murtaza told Dammanwalla Jay's shady business dealings were probably the motive for the murders.

14

Murtaza once asked Coronado if he would like to earn some extra money. When Coronado said he was interested, Murtaza told him that someone was willing to pay $100,000 to "take care of" a middle-aged couple in Anaheim. Coronado declined.

Velasco said Murtaza frequently talked about wanting to "take[] out" his girlfriend's parents. Murtaza even offered Velasco money to find a hit man for him. Velasco agreed to try to find a hit man because Murtaza was his boss, but Velasco testified he had no intention of actually finding a hit man for Murtaza.

## 2. *Defense Evidence*

Murphy called Raymond Nettleton, Ph.D., an expert in cellular technology. Nettleton challenged the prosecution's ability to pinpoint Murphy's location using cell phone technology. With respect to the 8:32 p.m. call on May 21, Nettleton testified the evidence showed only that Murphy's phone was somewhere in Anaheim at the time. He also testified no more precision was possible for the May 22, 12:47 a.m. call that placed Murphy and Murtaza in Van Nuys.

Murphy also called a number of character witnesses. His mother, Wendie Landon-Murphy, testified Murphy was at his sister's home on May 22 when she learned of the fire at Concordia University. She called his cell phone and he answered. Debra Pounds, the mother of two of Murphy's childhood friends, testified Murphy had a reputation for being a nonviolent and honest person. Derrick Ates, Murphy's college roommate, testified Murphy was nonviolent, but sometimes brutally honest. Martin Schramm, one of Murphy's professors at Concordia University, testified Murphy was positive and cooperative and seemed honest.

## DISCUSSION

### 1. *Sufficiency of the Evidence*

Murphy challenges the sufficiency of the evidence to prove he was Murtaza's accomplice in the murders. He claims only four items of evidence link him to the crimes: (1) his May 21 text exchange with Murtaza; (2) his May 21, 8:30 p.m. call to

15

his voicemail that used a cell tower three-quarters of a mile from the Dhanak home; (3) his false statements to police after the crimes; and, (4) his May 24 instant message exchange with Murtaza. Murphy asserts each item of evidence is also of questionable value. In essence, Murphy asks us to reweigh the evidence and come to a different result. Murphy misapprehends the standard of review.

Our role when addressing a challenge to the sufficiency of the evidence is to evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Story* (2009) 45 Cal.4th 1282, 1296; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) Moreover, we accept any logical inferences the jury could have drawn from any circumstantial evidence because the jury, not the reviewing court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

By all accounts, Murtaza formed an unwavering desire to kill Shayona's family, and he made repeated attempts to enlist the support of a surprising number of people in this endeavor. Most of the people Murtaza talked to immediately begged off. But when Murtaza asked Murphy for help, Murphy replied, "Come get me."

Cell phone records indicate Murphy and Murtaza were together, from around 2:30 p.m. on May 21until the following morning. During that time, Murphy and Murtaza traveled to each other's homes and did some research on the Dhanaks. But between 8:30 and 9:30 p.m., Murphy's and Murtaza's cell phones were about three-quarters of a mile away from the Dhanak home. Moreover, Murphy did not answer 16 calls received by his cell phone from about 8:30 p.m. on May 21 to around 1:00 a.m. May 22, something his call history showed to be unusual.

Plus, when questioned by police, Murphy denied being with Murtaza at all. He even denied knowing Murtaza had broken up with Shayona. However, the jury heard

16

facts like Murphy's repeated denials of any contact with Murtaza when questioned by police, the nature of his texts to Murtaza, and the movement of their cell phones on the night of the murder, all of which led the jury to conclude Murphy was with Murtaza during the murders.  The jury could have made other, diametrically opposed inferences from the evidence, but that alone does not require reversal of the judgment.  Based on the evidence presented at trial, and the reasonable inferences to be drawn from it, substantial evidence supports the verdict.

## 2. Prosecutorial Misconduct

### a. Factual Background

Near the end of the trial, the prosecutor, Howard Gundy, addressed the court regarding his upcoming closing argument:  "[Gundy]:  The last time I argued the case with Mr. Molfetta [defense counsel], he had presented pretty much the same character evidence that he did at this particular trial.  And during that, my closing arguments, I wanted to make reference to a very high profile case that was in the news and kind of illustrated the fact that people can live with someone their whole lives and not know them, and I mentioned the individual by the name of Jerry Sandusky.  There was a couple of objections and I was not drawing a comparison to Mr. Murphy to coach Sandusky; only the fact that he was an individual that was very well-respected in the community, seemed to have done a lot of good, and it turns out folks were wrong."[6]

Molfetta, objected to the proposed argument on grounds of relevance and prejudice.  Molfetta asserted, "I think it's such a well-known case.  Taking the example

---

[6] A few months before Murphy's trial, a jury convicted Sandusky, a retired assistant coach at the Pennsylvania State University, of 45 counts related to his systematic molestation of teenaged and adolescent boys.  The convictions were the end result of a lengthy and notorious investigation.  (*Commonwealth v. Sandusky* (2013) 70 A.3d 886, 889.)

of the *Zurinaga*[7] case, hey, we all know 19 guys can fly some planes into some buildings, you don't mention a name, we don't mention any names . . . ." Gundy replied, "I know exactly the point I want to make. I'll go in, make it, and get out." Molfetta renewed his relevance and prejudice objections and asked the court to consider it an ongoing objection. The court tentatively ruled the prosecutor could reference the facts of the Sandusky case, but there was to be no mention of the name Sandusky.

A few minutes into Gundy's closing argument, he focused on defendant's character witnesses: "we had character evidence in this particular case. As I sat there and listened to it, the witnesses – there were three of them I believe that gave character evidence excluding I think Mrs. Wendie Murphy. [¶] One was Mr. Schramm. He taught the defendant four classes, four classes at Concordia University. Now, ladies and gentlemen, I submit to you is that a great character reference, someone that has never seen this guy off campus except for when he visited him over at the – over at the Orange County jail? I suggest to you that that tells you a lot more about Mr. Schramm than it does about Mr. Murphy. [¶] The same thing with Debra Pounds. Seems like a very good and decent woman. She is a childhood friend. Her children are childhood friends of Mr. Murphy. Does she really see Mr. Murphy in the social settings that would maybe reveal the character malignancies that this individual has? Probably not. [¶] Again, what happens is, is that Mrs. Pounds, her coming in and testifying says more about her than it does about Charles Murphy. [¶] And the same thing with Derrick Ates. That talks more – Derrick knew Mr. Murphy because they were roommates for four years in college. They'd go their separate way in the summer. They worked at the same store; we don't know for how long. [¶] But what happens is that that talks more about Derrick Ates and about Debra Pounds and Mr. Schramm. It talks about them being good and decent people, not the defendant Murphy. [¶] We see this time and time again in the news.

_____

7  (*People v. Zurinaga* (2007) 148 Cal.App.4th 1248 (*Zurinaga*).)

18

Like, for example, we can look in the – in the weekly we can see stories about someone who's been convicted of a crime or has been arrested for a crime and what happens is the media loves to talk about people that knew this individual and say, how could this person have been – have done this right under our noses? [¶] In fact there's a very famous case about a college back east where the coach or assistant coach or something in this college program was doing very inappropriate things for years and years and years. And what happened is when that person was arrested, he – people came forward and said, 'No way. That guy he's done so much for the community. There's absolutely – I've known that man. There's no way.' [¶] Now I'm not drawing a comparison between Mr. Murphy and what that individual did. That's not the point here at all. The point here is to say that when people talk about character evidence about what they see, what they're doing is they're really reflecting back what they are, not what the defendant is. [¶] And we can see that because what happens is there is clearly a malignancy in . . . Murtaza. And when . . . Murtaza deals with . . . Murphy, what happens is that aspect of his personality, that malignancy that he doesn't show to everybody but he does show it to some different people, what happens is Murphy and Murtaza reflect that malignancy back at one another. And that's what this is like."

  *b. Analysis*

   Murphy asserts the quoted passage constitutes prosecutorial misconduct because Gundy referred to the facts of the Sandusky case.[8] "'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises

---

   [8] The Attorney General argues Murphy forfeited the issue by failing to object at every instance now urged on appeal. The point is not well taken. First, Molfetta lodged a continuing objection. Second, Molfetta most likely did not interpose an objection on grounds of prosecutorial misconduct because Gundy stayed within the limits of the court's ruling. Consequently, a defense objection would have been futile. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

19

a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"' [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.) However, "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.)

Prosecutors are given wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences and deductions from it. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) While a prosecutor can commit misconduct by making an inappropriate analogy to recent events (see *Zurinaga*, *supra*, 148 Cal.App.4th at pp. 1254-1260), that is not what happened here.

After briefly discussing the facts of "a very famous case about a college back east where the coach or assistant coach or something in this college program was doing very inappropriate things for years and years," the prosecutor said, "Now I'm not drawing a comparison between Mr. Murphy and what that individual did. That's not the point here at all. The point here is to say that when people talk about character evidence about what they see, what they're doing is they're really reflecting back what they are, not what the defendant is."

There was no misconduct in making this apt analogy. The record does not support defendant's interpretation of Gundy's argument. Defendant produced character witnesses to testify he is not violent and of good character. Gundy simply argued that character witnesses can be wrong in their assessments of a defendant's character. Gundy used facts drawn from an infamous case to make these points, but he made no direct reference to Sandusky. Nor did Gundy impugn the veracity of defendant's character

20

witnesses, he merely asked the jury to carefully consider the weight to be given to their testimony. Gundy's analogy was general, brief, and appropriate. (Compare *Zurinaga*, *supra*, 148 Cal.App.4th 1258-1259 [court found misconduct because prosecutor's reference to September 11, 2001 was not brief, referred to facts not in evidence, and the analogy had been inapt].)

Murphy also complains that Gundy's analogy forced Molfetta to explain the reference. Molfetta did later identify the subject of Gundy's analogy ("coach Sandusky"). But, Gundy did not force Molfetta to reveal Sandusky's name. Instead, Molfetta made a reasonable tactical decision to identify the subject of Gundy's analogy and then urge the jurors to disregard it. Such a tactical decision will not be questioned on appeal unless there could be no reasonable explanation. (*People v. Carrasco* (2014) 59 Cal.4th 924, 982 ["""""[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected"""""].)

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.

21